**ROSEMONT ENTERPRISES, INC.,**
**Plaintiff,**

**v.**

**RANDOM HOUSE, INC. and John Keats,**
**Defendants.**

**No. 66 Civ. 1532.**

United States District Court
S. D. New York.
June 25, 1966.

58

———◆———

Katz, Moselle & Schier, New York City, for plaintiff; Jack J. Katz, Chester C. Davis, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for defendant Random House, Inc.; Edward C. Wallace, Horace S. Manges, Marshall C. Berger, New York City, of counsel.

Robert W. Maris, Philadelphia, Pa., for defendant John Keats.

OPINION

FREDERICK van PELT BRYAN, District Judge.

In this action for copyright infringement seeking injunctive relief, damages and an accounting, plaintiff moves pursuant to 17 U.S.C. §§ 101 and 112 [1] and Rule 65, F.R.Civ.P., for a preliminary injunction against further publication, distribution, advertising and sale of the allegedly infringing publication.

Plaintiff Rosemont Enterprises, Inc. (Rosemont) is the present owner of the copyrights of three articles entitled "The Howard Hughes Story" by Stephen White, which were published in Look magazine in the issues of February 9, February 23 and March 9, 1954. On May 23, 1966 defendant Random House, Inc. (Random House) published a book entitled "Howard Hughes, a biography by John Keats" (defendant Keats). Howard Hughes is a rather enigmatic contemporary personality of considerable public interest.

Rosemont claims that the Random House biography of Hughes infringes the copyrighted Look articles which it owns by (1) directly quoting passages from the articles, (2) by copying material from the articles which is paraphrased in the book, and (3) by appropriating information from the articles obtained as a result of the author's research in lieu of independent research of its own. It urges that a prima facie case of infringement has been made out and that it is entitled to a preliminary injunction to prevent irreparable damage.

Defendants Random House and Keats deny any infringement of the Look copyrights and claim that whatever use was made of the material contained in such articles in their Hughes biography was permissible "fair use." They further claim that preliminary injunctive relief should be denied to Rosemont on various equitable considerations, including the "unclean hands" doctrine and failure to show any irreparable damage.

There is no dispute as to the validity of the copyrights on the Look articles or that Rosemont purchased them from Cowles Magazines, Inc., the publishers of Look, on May 20, 1966. Nor is there

[1]. § 101. "If any person shall infringe the copyright in any work protected under the copyrights laws of the United States such person shall be liable: (a) Injunction. —To an injunction restraining such infringement; * * *."

§ 112. "Any court * * * shall have power, upon complaint filed by any party aggrieved, to grant injunctions to prevent and restrain the violation of any right secured by this title, according to the course and principles of courts of equity, * * *."

any question that Random House and Keats had access to the articles and were thoroughly familiar with them.

The basic questions presented here are (1) what use was made of the Look articles in the Random House book; (2) was such use a prima facie infringement of the Look copyrights as Rosemont claims; or (3) was such use permissible "fair use" as Random House contends.

The background facts here are of considerable importance.

### (1)

Stephen White, the author of the Look articles was Assistant Managing Editor of Look and on its full-time staff. According to the affidavit of Leslie Midgley, the then Managing Editor of Look, under whose direction and supervision the articles were researched and written, White, Midgley and others on the Look staff worked on the project for some eight months; White interviewed dozens of people, assembled information from sources in various sections of the country, and had a number of personal conferences with Howard Hughes over some five months. The articles were based on this research.

The Look articles contain some 13,500 words and cover 18 of the over-size pages of Look interspersed with illustrations. The written material in the articles would fill from 36 to 39 pages of the size used in the Random House biography. The Look articles were characterized by Loomis, the senior Random House editor in charge of its Hughes biography as "by far the most authoritative pieces [on Howard Hughes] ever done."

### (2)

Random House had been considering a biography of Hughes for some time prior to 1962. The preparation of the book seems to have been precipitated by an article on Hughes which appeared in the September 7, 1962 issue of Life magazine written by Thomas Thompson, a member of the Life staff. On the day that issue appeared, Random House wrote to Thompson proposing that he write a biography of Hughes for publication by it. On September 28, 1962 Thompson agreed to deliver a completed manuscript on the life of Hughes in seven to eight months, while retaining his full-time employment with Life. He was given a $5,000 advance for writing and research and his total compensation was to be $12,500 and royalties. Random House knew that Thompson could only work on this book in his spare time since he was employed full-time by Life.

Thompson states that he did research on Hughes, personally interviewing some 15 people listed by name and a number of others, and employed a Texas newspaper man part-time to interview a number of Houston people.

Thompson was unable to produce a publishable manuscript within the seven to eight months allotted. However, he eventually submitted a draft manuscript which Loomis, the Random House editor, considered to require substantial additional work. By then Thompson had assumed added responsibilities in the Life organization and was unable to go further with the project.

Little additional was done on the book from the middle of 1963 to the latter part of 1964. Random House then sought another author to complete the book based on the work which Thompson had done and the materials available to him. Defendant Keats who had written several successful non-fiction books was engaged to complete the Hughes biography on that basis. Thompson's manuscript, news and copyrighted magazine articles, including the Look articles, and various other materials were turned over to Keats.

However, Keats was anxious to have further research done and requested that Random House provide him with a research assistant or funds for research. He also suggested that he attempt to interview Hughes in order to verify and supplement the material available. Finally, he suggested that permission be obtained for the use of copyrighted material before him. All of these requests were turned down by Loomis and Keats was directed to proceed with the material

he had at hand. At about this time Loomis wrote to Keats specifically calling his attention to the "authoritative" Look articles in case he had not already seen them.

During the editing of Keats' manuscript, there were numerous discussions about problems of copyright infringement and suggestions were made by Loomis that there be more paraphrasing and less quoting.

The Random House biography covering Hughes' activities through roughly 1965 is 304 pages long and contains about 116,000 words. Its publication date was May 23, 1966.

### (3)

Rosemont is a Nevada corporation organized in September 1965 by two officers of the Hughes Tool Company and Hughes' attorney in New York, who are the sole stockholders. Its California offices were leased and furnished by one of Hughes corporations and its New York offices are those of Hughes' attorney. Even before it was formally organized, Rosemont entered into a contract with Howard Hughes on July 2, 1965, granting it the exclusive rights to publish and sell an authorized Hughes biography. Rosemont claims that it is presently engaged in preparing an authoritative biography of Hughes, has engaged a researcher and a writer and has spent or obligated some $27,000 on the project. Rosemont makes the further claim that the research necessary for a comprehensive Hughes biography would take two years to complete and would require an investment of over $100,000.

After negotiations, commenced in early April 1966, Rosemont, on May 20, 1966, acquired from Cowles Magazines, Inc., the publishers of Look, the copyrights for the Look articles for a consideration which included the grant to Look magazine of the right to negotiate with Rosemont for the exclusive serial rights on its authorized Hughes biography. The next day, counsel for Random House were informed that Rosemont claimed infringement. This action followed on May 26, 1966.

There had been several earlier conversations between attorneys for Hughes and executives of Random House in 1965 in which it was indicated that Hughes was opposed to the publication of the Random House biography and would make trouble if the book was published.

On February 17, 1966 Rosemont commenced suit in the New York Supreme Court against Random House and Keats. The precise nature of this action has not been made clear but as far as I can ascertain it is an action in the nature of unfair competition and invasion of rights of privacy. Depositions were taken in that action, several of which were made part of the record on this motion.

### (4)

The basic test of copyright infringement is "whether the one charged with infringement has made an independent production, or made a substantial and unfair use of the complainants' work." Nutt v. National Institute Inc. for Improvement of Memory, 31 F.2d 236, 237 (2 Cir. 1929); Davis v. E. I. DuPont de Nemours & Co., 240 F.Supp. 612, 617 (S.D.N.Y.1965); see Orgel v. Clark Boardman Co., 301 F.2d 119, 120 (2 Cir.), cert. den., 371 U.S. 817, 83 S.Ct. 31, 9 L.Ed.2d 58 (1962).

In order to determine whether there is infringement in a given case it is necessary to consider the extent to which use was made of the work claimed to be infringed and of its author's creative effort, expression, and original research as well as the nature of the work which is claimed to infringe and the amount of independent and original creative effort and research which went into its production.

### (a)

The length of the three Look articles (some 13,500 words or 36 to 39 book size pages) is somewhat more than 11% of the length of the Random House book (some 116,000 words and 304 pages). The articles cover the Howard Hughes

story up to 1954 when they were published, whereas the book carries Hughes up to 1965 and obviously contains a great deal of later material not touched on in the articles.

Rosemont claims that there are at least 41 separate instances of copying from the Look articles in the Random House book, comprising 27% of the first article and 14% of all three.

There is no doubt that there is copying. There are some 31 lines (about 256 words) in the book of direct quotations from the articles with credit to Stephen White, the author. In addition, some 8 lines (about 80 words) of the book concededly paraphrase a portion of the articles with White also credited.

Two of the quoted passages are those relating to the clash between Senator Brewster and Hughes at Senate Committee hearings (p. 210) and the appraisal of Hughes used at the opening paragraph of Chapter 30 (p. 265).

■ Both of these quotations are no doubt based upon facts but they are no mere recitals of fact. They are an expression by White of his own ideas and conclusions expressed in his own style and language and represent his own creative efforts. While it is of course true that historical facts in a biographical piece are not copyrightable in themselves but are in the public domain, see, Collins v. Metro-Goldwyn Pictures Corp., 106 F.2d 83, 86 (2 Cir. 1939); Lake v. Columbia Broadcasting System, Inc., 140 F.Supp. 707 (S.D.Calif.1956); Nimmer, Copyright 127–128 (1964); cf. Oxford Book Co. v. College Entrance Book Co., 98 F.2d 688, 691 (2 Cir. 1938), the manner in which such facts are expressed by the author and his own thoughts, descriptions and conclusions are plainly entitled to copyright protection. See, e. g., Eisenschiml v. Fawcett Pub., Inc., 246 F.2d 598, 603 (7 Cir.), cert. den., 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957); De Acosta v. Brown, 146 F.2d 408, 410 (2 Cir. 1944), cert. den., Hearst Magazines v. De Acosta, 325 U.S. 862–863, 65 S.Ct. 1197, 89 L.Ed. 1983 (1945); Holdredge

v. Knight Pub. Corp., 214 F.Supp. 921, 923 (S.D.Calif.1963). See generally, Nimmer, supra at pp. 128–132. These passages clearly fall into this category.

■ Two conversations, one between Hughes and the actor Skelton (p. 27), and the other between White and "one of Hollywood's best known stars" (pp. 266–267), are also quoted verbatim. While conversations of this nature may have taken place, as recounted by White, they are not mere uncopyrightable historical facts as Random House claims. The quoted material is White's own version of what occurred, expressed in his own language and part of his effort to picture Hughes and his personality and is thus copyrightable. See, e. g., Harris v. Miller, 50 U.S.P.Q. 306, 307–308 (S.D. N.Y.1941); Davies v. Bowes, 209 F. 53, 56 (S.D.N.Y.1913), aff'd on other grounds, 219 F. 178 (2 Cir. 1914); Gilmore v. Anderson, 38 F. 846, 848 (C.C. S.D.N.Y.1889). Compare Holdredge v. Knight Pub. Corp., supra, 214 F.Supp. at p. 923. Even assuming that the dialogue involving White himself was an exact repetition of the conversation, certainly White's part in the conversation would be original and would have contributed to the reply elicited It likewise is copyrightable material. See Harris v. Miller, supra, 50 U.S.P.Q. at p. 308; Nimmer, supra, at 129.

■ The 8 lines of conceded paraphrasing at page 244, also credited to White, deal primarily with facts. Random House contends that since this passage deals with factual materials which may be available from sources open to all, this material is not copyrightable. See Oxford Book Co. v. College Entrance Book Co., 98 F.2d 688 (2 Cir. 1938); Consumers Union of United States, Inc. v. Hobart Mfg. Co., 189 F.Supp. 275, 278 (S.D.N.Y.1960). The argument is not well taken. While the facts dealt with may not be copyrightable in themselves, White's choice of words and style in expressing the facts or describing them is plainly entitled to copyright protection. See, e. g., Guthrie v. Curlett, 36 F.2d 694, 696 (2 Cir. 1929); Chicago Record-

Herald Co. v. Tribune Ass'n, 275 F. 797, 799 (7 Cir. 1921); Davies v. Bowes, 209 F. 53, 55–56 (S.D.N.Y.1913) aff'd on other grounds, 219 F. 178 (2 Cir. 1914); Ball, Copyright and Literary Property, 240–241 (1944); cf. Holmes v. Hurst, 174 U.S. 82, 86, 19 S.Ct. 606, 43 L.Ed. 904 (1899).

■ It is of course well settled that copying can be done by paraphrase as well as by literal reproduction and that such paraphrasing may be an infringement. See, e. g., Nutt v. National Institute for Improvement of Memory, 31 F.2d 236, 237 (2 Cir. 1929); West Pub. Co. v. Lawyers' Co-operative Pub. Co., 79 F. 756, 763, 35 L.R.A. 400 (2 Cir. 1897) quoting with approval, Lawrence v. Dana, 15 Fed.Cas. 26, No. 8,136 (D. Mass.1869); Davis v. E. I. DuPont de Nemours & Co., 240 F.Supp. 612, 621 (S.D.N.Y.1965).

■ The crediting of the quoted and concededly paraphrased material to White does not remove it from copyright protection. See Toksvig v. Bruce Pub. Co., 181 F.2d 664, 666 (7 Cir. 1950); Chicago Record-Herald Co. v. Tribune Ass'n, 275 F. 797, 799 (7 Cir. 1921); Henry Holt & Co., to Use of Felderman v. Liggett & Myers Tobacco Co., 23 F.Supp. 302, 304 (E.D.Pa.1938); Nimmer, supra, at p. 644.

Beyond the material quoted verbatim or concededly paraphrased, there are at least 12 instances where the use of particular phrases or slight rearrangement of language and sentence structure make it obvious that Look material was copied by paraphrase.

Four examples will suffice. At page 25 of the Look articles Hughes' first wife is described as the

" * * * charming daughter of the distinguished Houston family that had given its name to Rice Institute. But Miss Rice was a few months older than Hughes, and her circle of male admirers was many years older * * *."

This is paraphrased at page 17 of the book as follows:

"His bride was Ella Rice, a dark-haired, high-spirited daughter of the family that gave Rice Institute its name. She was some months older than he, and had beaux who were years older * * *."

Again describing Ella Hughes, the Look article reads at page 27

"This was not what the belle of Houston had bargained for. She had been the idol of the young men and women of Texas, and a beauty whose invitations ranged throughout the entire south * * *."

This passage is paraphrased at page 38 of the book in the following language:

"She had been one of the most popular, sought-after women in Texas, quite literally the belle of the ball; a young woman with invitations to gentle homes throughout the south * * *."

At page 23 of the Look articles, in discussing Hughes' predilection for employing Mormons it is said:

" * * * An active Mormon tends to be a man of integrity who devotes himself slavishly to his job, and who neither drinks, smokes, nor gambles."

At page 244 of the book this passage is paraphrased:

" * * * Hughes chose Mormons to serve him because the devout Mormon does not drink, smoke or gamble, [and] tends strictly to his job. * * *"

At page 25 of the Look articles it is said that

"The company, under his [Hughes] management, *leaped ahead* * * *."

At page 17 of the book it is said

"The already prosperous company *leaped ahead* under its new owner * * *."

It is highly unlikely that these and the other instances of the use of identical or highly similar wording, phrasing and structure could be the result of mere coincidence, particularly in the light of facts regarding the preparation and writing of the Random House biography which will be later discussed.

There are also a number of instances where facts, events or anecdotes in the Look articles are recounted in the book, but in language which, while not entirely dissimilar, cannot be said to be obvious paraphrasing.

 Copying by paraphrasing may occur even where there is little or no identity of language between the respective passages, Nutt v. National Institute for Improvement of Memory, supra 31 F.2d at p. 237, and where, as here, it appears that the claimed infringer had access to and used the work claimed to be infringed, and copied portions of it, it may reasonably be inferred that additional portions dealing with the same subject matter have been appropriated even without identity of language. See West Pub. Co. v. Lawyers' Co-operative Pub. Co., 79 F. 756 (2 Cir. 1897); Ricker v. General Elec. Co., 162 F.2d 141, 142 (2 Cir. 1947). Such an inference may fairly be drawn here.

 Finally, various anecdotes in the Look articles also recounted in the Random House book were available from other published sources. An example is the incident concerning Hughes' presence at the Harvard-Yale boat race with his father, appearing at pages 24 and 25 of the Look articles and pages 8 and 9 of the Random House book which had appeared in a 1938 article in the New Daily News and a July 1954 Associated Press story.[2]

It is not without significance that in these instances the Random House accounts bear a closer resemblance in terms of both style and content to the Look accounts than they do to the other available sources. And this is particularly significant in the light of the background facts concerning the preparation and writing of the Random House book. See West Pub. Co. v. Lawyers' Co-operative Pub. Co., supra, 79 F. at p. 762.

**2.** Of course, if the Associated Press story was taken from the Look articles in violation of the Look copyrights, this would neither remove the copyright protection

(b)

 Was the use thus made of the material from the Look articles substantial? Plainly the Random House biography includes a great deal of material which is not covered by the Look articles at all. But the test of substantiality in terms of copyright infringement is not how much of the allegedly infringing work was taken from the copyrighted material but how much of the copyrighted material was taken by the infringing work. See Toksvig v. Bruce Pub. Co., 181 F.2d 664, 667 (7 Cir. 1950); Sheldon v. Metro-Goldwyn Pictures, Corp., 81 F.2d 49, 56 (2 Cir. 1936); West Pub. Co. v. Lawyers' Co-operative Pub. Co., 79 F. 756, 763 (2 Cir. 1897) quoting with approval from Lawrence v. Dana, 15 Fed. Cas. 26 (No. 8,136) (D.Mass.1869); Henry Holt & Co. to Use of Felderman v. Liggett & Myers Tobacco Co., 23 F.Supp. 302, 303–304 (E.D.Pa.1938); 56 Colum.L.Rev. 585, 593–594 (1956).

 Moreover, the question of infringement is not solely one of lines or inches but is concerned also with the quality and value of what is taken from the copyrighted work. See, e. g., Toksvig v. Bruce Pub. Co., supra, 181 F.2d at p. 667; De Acosta v. Brown, 146 F.2d 408, 410 (2 Cir. 1944), cert. den., Hearst Magazines v. De Acosta, 325 U.S. 862–863, 65 S.Ct. 1197 (1945); Chicago Record-Herald Co. v. Tribune Co., 275 F. 797, 799 (7 Cir. 1921). See generally Ball, supra, at pp. 334–337.

As stated by Justice Story over a hundred years ago in the leading case of Folsom v. Marsh, 9 Fed.Cas. 342 (No. 4,901) (D.Mass.1841):

"If so much is taken, that the value of the original is sensibly diminished, or the labors of the original author are substantially to an injurious extent appropriated by another, that is sufficient, in point of law, to constitute a piracy pro tanto. * * * It

nor permit the defendants to use the Look material. See Gilmore v. Anderson, 38 F. 846, 849 (C.C.S.D.N.Y.1889).

is no defence that another person has appropriated a part, and not the whole, of any property." (P. 348).

The various anecdotes and incidents which have been appropriated are an important part of the articles and contribute a great deal to their color and tone. Their importance is emphasized by the fact that much of this material was obtained as a result of extensive interviews which the author and his research associates had with Hughes who is well known for his unapproachability and that Keats had conducted no interviews as his attempt to interview Hughes was turned down by Random House.

Material which White and his associates obtained in the Hughes interviews is used extensively in the articles and gives an impression of authenticity which may well have led Random House to describe them as authoritative. Moreover, it is White's writing about the materials obtained from his various sources, using his individual language and form of expression which gives value to the articles.

Without attempting to appraise the value of the Look articles here, whatever value they had was "sensibly diminished" by the use made of portions of them in the Random House biography and the labors of the author were substantially and to an injurious extent appropriated. See also MacDonald v. Du-Maurier, 144 F.2d 696, 697, 700, 701 (2 Cir. 1944); Karll v. Curtis Pub. Co., 39 F.Supp. 836 (E.D.Wisc.1941); Boosey v. Empire Music Co., 224 F. 646 (S.D.N.Y. 1915).

█ What was taken from the Look articles was substantial in both the quantitative and qualitative sense. The amount of material copied in terms of words and linage, though it may not constitute as much as 27% of the first article and 14% of the articles as a whole claimed by Rosemont, nevertheless amounts to a substantial portion of the work and cannot be considered de minimis. Compare Toulmin v. Rike-Kumler Co., 316 F.2d 232 (6 Cir. 1963); West Pub. Co. v. Lawyers' Co-operative Pub.

Co., 79 F. 756, 759–761 (2 Cir. 1897); Henry Holt & Co., to Use of Felderman v. Liggett & Myers Tobacco Co., 23 F. Supp. 302 (E.D.Pa.1938); Da Prato Statuary Co. v. Giuliani Statuary Co., 189 F. 90 (C.C.Minn.1911).

### (c)

When the materials from the Look articles used in the Random House biography, the facts and circumstances before the court as to the writing of the book, the source material used and the research conducted, are considered together, there are strong indications that Look copyrighted material was used in substitution for independent research.

At the time Random House first engaged Thompson to write a Hughes biography it said "We want a lively fast moving unauthorized biography * * *." This is just what it got.

The book is not and does not purport to be a profound and scholarly biographical work. It is written in a journalistic vein to appeal to the popular market. The comment by the Kansas City Times reviewer that " * * * [the book] might be called 'instant biography,' the type put together with information that has already appeared in newspapers and magazines," may not be entirely a fair one, and other more favorable reviews should not necessarily be discounted. But the book does rely heavily on previously published newspaper and magazine articles and similar sources.

It appears that Random's budget for the book did not provide any substantial funds for research and that it did not expect very much research to be done. Thompson who first worked on the book was able to do so only in his spare time and was given a relatively brief period in which to produce a manuscript. Thompson's account of the research in which he engaged is not impressive.

When Thompson found he did not have time to complete the book and the task of finishing it was turned over to Keats, all Keats appears to have had before him was Thompson's manuscript and the pre-

viously published materials which Thompson had used. Thompson's manuscript has not been produced here.

Keats apparently was anxious to do additional research. His request for funds for this purpose was turned down by Random House and Keats was told to go ahead with the material he had.

Keats also suggested that he attempt to interview Hughes. This request was also refused.

Finally, Keats suggested that permission be obtained for the use of copyrighted material. This request was also refused and in several instances it was suggested to Keats that he paraphrase more in order to avoid copyright difficulties.

The copyrighted material available to both Thompson and Keats included the Look articles on which the Random House editor laid emphasis and which he described as the most authoritative pieces about Hughes yet written.

 It may be, as Random House claims, that much of the material taken could have been obtained from other sources open to all. But it is no answer to a charge of infringement that the infringing work could have been created using elements fairly at the author's disposal. See Davis v. E. I. DuPont de Nemours & Co., 240 F.Supp. 612, 620 (S.D.N.Y.1965); Alva Studios, Inc. v. Winninger, 177 F.Supp. 265, 268 (S.D. N.Y.1959).

"The question is not whether * * * [author] could have obtained the same information by going to the same sources, but rather did * * * [he] go to the same sources and do * * * [his] own independent research?" Toksvig v. Bruce Pub. Co., 181 F.2d 664, 667 (7 Cir. 1950); see Nutt v. National Institute for Improvement of Memory, 31 F.2d 236, 237 (2 Cir. 1929). For an author is no more entitled to appropriate the fruits of another's labor and research than he is to use another's form of expression. See, e. g., Orgel v. Clark Boardman Co., 301 F.2d 119, 120 (2 Cir.) cert. den., 371 U.S. 817, 83 S.Ct. 31 (1962); Eisen-

schiml v. Fawcett Pub. Inc., 246 F.2d 598, 602–603 (7 Cir.), cert. den. 355 U.S. 907, 78 S.Ct. 334 (1957); West Pub. Co. v. Lawyers' Co-operative Pub. Co., 79 F. 756, 763 (2 Cir. 1897); Fred Fisher, Inc. v. Dillingham, 298 F. 145, 150 (S.D.N.Y.1924) (L. Hand, J.); Nimmer, Copyrights, 132–134 (1964). Here there are elements of the former as well as the latter.

(d)

 On the record before me as a whole I conclude that a prima facie showing of infringement of the Look copyrights by the Random House biography has been made.

(5)

Random House claims that there can be no infringement here because it made "fair use" of whatever materials were taken from the Look articles.

 "Fair use" is "a privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner * * *." Ball, Copyright And Literary Property 260 (1944); see Toksvig v. Bruce Pub. Co., 181 F.2d 664, 666 (7 Cir. 1950); Holdredge v. Knight Pub. Corp., 214 F.Supp. 921, 924 (S.D.Calif.1963). To determine whether fair use has been made of copyrighted material, the nature and objects of the selections made, the quantity and value of the material used and the extent to which the use may diminish the value of the original work, must be considered. See, e. g., Loew's Inc. v. Columbia Broadcasting System, Inc., 131 F. Supp. 165, 174–176 (S.D.Calif.1955) aff'd, Benny v. Loew's Inc., 239 F.2d 532 (9 Cir. 1956) aff'd without opinion by an equally divided court, 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583 (1958); Karll v. Curtis Pub. Co., 39 F.Supp. 836–837 (E.D.Wisc.1941); Henry Holt & Co., to Use of Felderman v. Liggett & Myers Tobacco Co., 23 F.Supp. 302 (E.D.Pa. 1938); Nimmer, supra at p. 645; see generally Ball, supra pp. 260–263.

■ In general "fair use" is limited to cases where copyrighted material is used for purposes of criticism or comment or in scholarly works of scientific or educational value. See, e. g., Holdredge v. Knight Pub. Corp., supra, 214 F.Supp. at 924; Loew's, Inc. v. Columbia Broadcasting System, Inc., supra, 131 F.Supp. at 175; Henry Holt & Co., to Use of Felderman v. Liggett & Myers Tobacco Co., supra, 23 F.Supp. at p. 304; 56 Colum.L.Rev. 585, 594 (1956).

■ Where the borrowing work does not fall into these categories permissible fair use is severely restricted. See Loew's, Inc. v. Columbia Broadcasting System, Inc., supra, 131 F.Supp. at 175. This is particularly so where the borrowing and borrowed works are of the same general nature, deal with the same subject matter, are published primarily for commercial purposes, and are likely to compete with one another to the detriment of the value of the copyrighted material. See Loew's Inc. v. Columbia Broadcasting System, Inc., supra, 131 F.Supp. at 173–174; Karll v. Curtis Pub. Co., supra, 39 F.Supp. at 837; Social Register Ass'n v. Murphy, 128 F. 116 (D.R.I.1904); Nimmer, supra, pp. 646–647; 56 Colum.L.Rev. supra, at 596–597.

■ An author is of course entitled to consult original authorities and sources and may be guided and assisted by earlier copyrighted works. See Benny v. Loew's, Inc., supra, 239 F.2d at p. 536; Greenbie v. Noble, 151 F.Supp. 45, 65 (S.D.N.Y.1957); Ball, supra at pp. 300–301. Indeed, there are bound to be marked resemblances between two works on the same subject matter. See Eisenchiml v. Fawcett Pub., Inc., supra, 246 F.2d at 604; Chautauqua School of Nursing v. National School of Nursing, 238 F. 151, 153 (2 Cir. 1916); Greenbie v. Noble, supra, 151 F.Supp. at 65. But an author is not entitled to appropriate the copyrighted fruits of another's labors in lieu of independent research. This is not "fair use." See Toksvig v. Bruce Pub. Co., supra, 181 F.2d at p. 666; Benny v. Loew's, Inc., supra, 239 F.2d at

p. 536; Social Register Ass'n v. Murphy, supra, 128 F. 116; Ball, supra at pp. 294, 300; see also Orgel v. Clark Boardman Co., 301 F.2d 119, 120 (2 Cir.), cert. den., 371 U.S. 817, 83 S.Ct. 31 (1962); West Pub. Co. v. Lawyers' Co-operative Pub. Co., 79 F. 756 (2 Cir. 1897); Nimmer, supra at pp. 132–34.

■ The "lively, fast moving" Random House biography is an account of an interesting current personality designed for the popular market. It can scarcely be said to be a scholarly scientific or educational work. It plainly is in competition with the Look articles dealing with the same current personality in the commercial market. The extensive borrowings from the Look articles in the well advertised and widely distributed Random House book can only diminish the value of the borrowed work.

The extent of the borrowings, the purposes for which the material was used and the apparent lack of independent research combine to indicate that there was not "fair use" of the Look material here. Compare MacDonald v. DuMaurier, 144 F.2d 696, 701 (2 Cir. 1944); Holdredge v. Knight Pub. Corp., supra, 214 F.Supp. at 924.

(6)

■ Random House urges that in any event Rosemont should be denied equitable relief here because it comes into a court of equity with "unclean hands." The rather involved argument runs this way:—Rosemont is a mere tool or creature of Howard Hughes; its agreement with Hughes for the publication of his authorized biography is a sham and there is no intention of ever publishing such a book; the purchase of the Look and other copyrights by Rosemont is part of a scheme by Hughes and his associates to suppress any biography of him; all this is demonstrated by the circumstances under which Rosemont was organized, the threats made by one of Hughes' attorneys to Random House to make trouble in the event its biography was published, the suit instituted against Random House by Rose-

mont in the New York Supreme Court and the purchase of the Look copyrights on the eve of the Random House date of publication;—all of which is said to show egregious misuse of the copyright statute. It is suggested that Rosemont's conduct is "almost barratry" and even poses a question of suppression of free speech of constitutional dimensions.

There are several difficulties with this theory. In the first place it is in large measure based on surmise and conjecture. It certainly cannot be said on the evidence before me that defendants have established even prima facie a plot or scheme to suppress any biography about Hughes.

But assuming, as defendants claim, that Rosemont is controlled by Hughes and is doing his bidding (and this is certainly not unlikely), and that Hughes' object is to take the Random House biography off the market, I do not see that anything has been done which is not within Hughes' or Rosemont's legal rights or is in violation of law.

In this action Rosemont is relying solely on its statutory rights to prevent infringement of the copyrights granted to the Look articles. It does not and could not urge here that no biography of Hughes can be published. As long as Random House does not appropriate copyrighted material belonging to Rosemont, it is free to publish any biography it chooses as far as this court is concerned. Whether any biography can be published may be an issue raised in the pending state court action (and the issues in that action are not at all clear to me) but is certainly not in any way before me.

Rosemont plainly had the right to purchase the copyrights of the Look articles from the responsible publishers of that magazine for a consideration, including the right to negotiate the first serial rights for an authorized Hughes biography. Hughes had the right to set up a corporation to publish his authorized biography and to acquire any copyrights of previously published material. Nothing has been shown to me which would bar the plaintiff from enforcing its rights as copyright owner if such rights have been violated.

The suggestion that the institution of this action by Rosemont is "almost barratry", i. e., "the practice of exciting groundless judicial proceedings," New York Penal Law, McKinney's Consol. Laws, c. 40, § 320, refutes itself. Nor can I discern any issue of constitutional dimensions involving free speech in this action for infringement of statutory copyright.

There is no showing here of misuse of copyright which would impel me to deny equitable relief in the exercise of my discretion or otherwise. See Nimmer, supra at pp. 662–664; Compare Greenbie v. Noble, 151 F.Supp. 45, 61–62 (S.D.N.Y.1957); Southern Music Pub. v. Seeco Records, Inc., 200 F.Supp. 705 (S.D.N.Y.1960); Columbia Pictures Corp. v. Coomer, 99 F.Supp. 481 (E.D. Ky.1951).

(7)

■ When a prima facie showing of copyright infringement has been made, plaintiffs are entitled to a preliminary injunction without the detailed showing of likelihood of irreparable damage which is ordinarily required for preliminary injunctive relief. See, e. g., Rushton v. Vitale, 218 F.2d 434, 436 (2 Cir. 1955); Joshua Meier Co. v. Albany Novelty Mfg. Co., 236 F.2d 144, 147 (2 Cir. 1956); American Code Co. v. Bensenger, 282 F. 829, 835 (2 Cir. 1922); Ball, supra at p. 650.

Plainly the value of the copyrighted Look articles will be permanently lessened by further circulation of the Random House biography with the infringing material included. Moreover, the value of any future Hughes biography published by Rosemont insofar as it may use the Look copyrighted material will be permanently impaired.

■ Random House urges that preliminary injunctive relief should be denied here because the damage that would result to its investment in its already

published book outweighs any harm which might be suffered by Rosemont. But wilful infringers, as defendants here appear prima facie to be, are not immune from the injunctive remedy because a substantial investment has been made in the infringing work. See L. C. Page & Co. v. Fox Film Corp., 83 F.2d 196, 200 (2 Cir. 1936); Inge v. Twentieth Century-Fox Film Corp., 143 F.Supp. 294, 301 (S.D.N.Y.1956); Ball, supra pp. 652–653.

Nor is injunctive relief barred because only part of the infringing work infringes. See, e. g., Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 56 (2 Cir. 1936); Historical Pub. Co. v. Jones Bros. Pub. Co., 231 F. 638, 644–645 (3 Cir. 1916); West Pub. Co. v. Lawyers' Co-operative Pub. Co., 79 F. 756 (2 Cir. 1897); Da Prato Statuary Co. v. Giuliani Statuary Co., 189 F. 90 (D.Minn.1911); Lawrence v. Dana, 15 Fed.Cas. 26, 62 (No. 8,136) (D.Mass. 1869); Copinger, Copyright (7 Ed. 1936) pp. 156–157.

I find there is a sufficient showing of irreparable damage to warrant the granting of preliminary injunctive relief.

## CONCLUSION

I conclude that Rosemont has shown sufficient grounds for the preliminary injunctive relief which it seeks on this motion.

1. Wilful infringement of the copyrights owned by Rosemont by the Random House biography has been shown prima facie.

2. It appears to a "reasonable certainty" that Rosemont will ultimately succeed on the merits of the action. Hall Signal Co. v. General Ry. Signal Co., 153 F. 907, 908 (2 Cir. 1907); see Societe Comptoir de L'industrie, etc., v. Alexander's Dept. Stores, Inc., 299 F.2d 33, 35 (2 Cir. 1962).

3. Sufficient irreparable injury to Rosemont's copyrights has been shown.

4. It appears that equities in favor of Rosemont sufficiently over-balance those in favor of Random House as to justify preliminary relief.

The motion of Rosemont for a preliminary injunction is granted. An injunction will issue restraining the defendants, pending the final determination of this action or until further order of this court, from publishing, distributing, advertising, or selling any copies of the biography of "Howard Hughes, a biography by John Keats" which contain material infringing the plaintiff's copyrighted Look articles. See Historical Pub. Co. v. Jones Bros. Pub. Co., 231 F. 638, 645 (3 Cir. 1916); West Pub. Co. v. Lawyers' Co-operative Pub. Co., 79 F. 756 (2 Cir. 1897); Social Register Ass'n v. Murphy, 128 F. 116, 121 (D.R.I.1904); Ball, supra p. 654.

Such an injunction will be conditioned upon a giving of security by plaintiff in the sum of $75,000 for the payment of such costs and damages as may be incurred or suffered in the event that the defendants are found to have been wrongfully enjoined, pursuant to Rule 65, F.R.Civ.P.

The foregoing opinion constitutes my findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.

Settle order on notice.