NEW ERA PUBLICATIONS INTERNA-
TIONAL, ApS, A Corporation of
Denmark, Plaintiff–Appellant,

v.

HENRY HOLT AND COMPANY, INC.,
A New York Corporation,
Defendant–Appellee.

Nos. 388, 421, Dockets 88–7707, 88–7795.

United States Court of Appeals,
Second Circuit.

Argued Sept. 30, 1988.

Decided April 19, 1989.

Michael Lee Hertzberg, New York City
(Eric M. Lieberman, Nicholas E. Poser,
David B. Goldstein, Rabinowitz, Boudin,
Standard, Krinsky & Lieberman, P.C., New
York City, of counsel), for plaintiff-appel-
lant.

Robert M. Callagy, New York City (W.
Mallory Rintoul, Mark A. Fowler, Satterlee
Stephens Burke & Burke, New York City,
of counsel), for defendant-appellee.

Before OAKES, MINER and
ALTIMARI, Circuit Judges.

MINER, Circuit Judge:

*Preface*

We re-visit the doctrine of fair use in this
action for copyright infringement brought
to enjoin publication of the biography of
Church of Scientology founder L. Ron Hub-

bard and to recover damages for the alleged infringement. The biography, written by Russell Miller, who is not a party to the action, is entitled: *Bare–Faced Messiah: The True Story of L. Ron Hubbard* (hereafter "the book" or "the biography"). The plaintiff in the suit, appellant here, is New Era Publications International, ApS ("New Era"), a Danish corporation. It holds by license certain copyrights bequeathed to the Church of Scientology by Hubbard, who died in 1986. The publisher of the book, Henry Holt and Company, Inc. ("Holt"), is the defendant in the action and the appellee here. New Era's claim that the extensive reproduction of Hubbard's published and unpublished writings in the biography amounts to infringement of the copyrights it holds is met by Holt's defense that the use of the Hubbard materials is "fair" and therefore not infringing within the meaning of the Copyright Act. The district court concluded that the use of the unpublished material "cannot be held to pass the fair use test" and therefore found "that *Bare–Faced Messiah* to some degree infringes Hubbard's copyrights in some of his previously unpublished works." *New Era Publications International, ApS v. Henry Holt and Co.*, 695 F.Supp. 1493, 1524–25 (S.D.N.Y.1988). For various reasons, however, the district court declined to issue an injunction, but instead relegated New Era to the remedy of damages. We affirm, although we conclude that laches is the sole bar to issuance of an injunction.

## I.

### Procedural History

This action was preceded by lawsuits commenced in 1987 to enjoin publication in England and Canada (each of these suits was dismissed for laches) and in Australia (this suit ultimately was withdrawn). Despite the fact that an attorney representing the Church of Scientology had corresponded with Holt in May of 1986 in an effort to discourage publication of the book, no action to enjoin publication was commenced in the United States until the complaint in this action was filed in the Southern District of New York on May 4, 1988. Immediately after filing the complaint, New Era applied for a temporary restraining order.

Judge Leval, to whom this case was assigned in the district court, initially denied the temporary restraining order for laches, noting the following in a written decision dated May 13, 1988:

> Never did the plaintiff take sufficient steps to obtain a copy of the book to determine whether it differed from the books published in England, Australia, and Canada. Never did the plaintiff ask Holt when it would be published. The plaintiff did not take any legal step until May 4 [1988] when it sought the temporary restraining order. By that time, as it turned out, the defendant had published the book, having printed and packed 12,000 copies, and having sent out review copies on April 27. With the exception of 3,000 copies that a trucker had failed to collect and which were waiting on the loading dock, the first printing had been shipped beyond the publisher's control. To fill additional orders, Holt had scheduled a second print run for May 6.

*New Era Publications International, ApS v. Henry Holt and Co.*, 684 F.Supp. 808, 809–10 (S.D.N.Y.1988).

A week later, on May 20, 1988, after New Era agreed to post an undertaking to indemnify Holt for any "unrecoverable expenses" incurred by Holt during the period of delay, Judge Leval granted a temporary restraining order restraining distribution of the second printing of the book. According to a Stipulation signed by the parties on May 31, 1988 and approved by Judge Leval on June 3, 1988, "unrecoverable expenses" include "a pro rata share of the overhead, with respect to the 10,000 book second printing and any books from the first printing returned to Holt, as a result of the Temporary Restraining Order issued by the Court on May 20, 1988 and incurred with respect to the advance payment to the author, and for advertising and publicity."

Thereafter, the parties proceeded with an expedited trial on submissions of evidence pertaining to the permanent injunction question. Judge Leval's opinion and order denying the injunction was issued on Au-

gust 9, 1988 (amended on August 16, 1988) and, on August 11, 1988, a partial judgment was entered "dismissing plaintiff's complaint only insofar as the complaint seeks entry of a permanent injunction." The judgment recites that trial of the damages issue will not be conducted in the near future; that Holt would be "irreparably harmed" if required to await a final judgment dispositive of all claims; that Holt is entitled to a final judgment denying a permanent injunction; and that "there is no just reason for delaying entry of such judgment." *See* Fed.R.Civ.P. 54(b).

Also entered in the district court on August 11, 1988 was an order vacating the temporary restraining order but staying the vacatur for three weeks to maintain the *status quo ante* pending an application for expedited appeal. On August 30, 1988, this Court granted New Era's motion for an expedited appeal and continued the stay until oral argument. Following oral argument, on September 30, 1988, the stay was continued pending the decision of this Court.

## II.

### The Book

The publisher summarizes the contents of the book in a blurb printed on the book's jacket:

> *Bare–Faced Messiah,* the biography of L. Ron Hubbard, makes for extraordinary reading. From his early days as a penniless author of "pulp" science fiction stories to his mysterious end, Hubbard was often in the news, usually at odds with society, frequently in trouble with the law. Born in 1911, the son of a struggling Nebraska businessman, he led a wandering, wildly romantic youth in which his dreams and his realities often became confused.
>
> While writing for the pulps in the 1930s he claimed to have made a discovery of such philosophical and psychological importance that it would change the world. From that discovery evolved the "science" of Dianetics which prospered briefly and then foundered in a sea of debt and writs. In 1952 Hubbard founded a far more ambitious program, Scientology, a new religion which claimed to give its adepts the ability to overcome all diseases of the mind and body....
>
> For nearly ten years he sailed the oceans as the commodore of his own private navy, served by nymphet messengers in hot pants who dressed and undressed him and were trained like robots to relay orders in his tone of voice.

> His last years were as peripatetic and unsettled as his youth, and far more paranoid. In 1980, fearing arrest, he disappeared and was never seen again. He died in January 1986 under circumstances as mysterious as his enigmatic life itself.

The tone of the book is set in the author's Introduction:

> For more than thirty years, the Church of Scientology has vigorously promoted an image of its founder, L. Ron Hubbard, as a romantic adventurer and philosopher whose early life fortuitously prepared him, in the manner of Jesus Christ, for his declared mission to save the world. The glorification of 'Ron', superman and saviour, required a cavalier disregard for facts: thus it is that almost every biography of Hubbard published by the church is interwoven with lies, half-truths and ludicrous embellishments. The wondrous irony of this deception is that the true story of L. Ron Hubbard is much more bizarre, much more improbable, than any of the lies.

The author purports to contrast factual and fictional accounts of Hubbard's life in almost every chapter of the book, drawing upon information gleaned from numerous sources: newspaper stories and other published accounts; personal interviews; letters; memoranda; records of various court proceedings; materials obtained under the Freedom of Information Act from United States government agencies; publications of the Church of Scientology; and Hubbard's own writings, published and unpublished. Hubbard was a prolific writer, and

the biography contains liberal quotations from his work, particularly from his unpublished early diaries and journals.

The book proceeds in conventional chronological order, commencing in Chapter 1 ("A Dubious Prodigy") with accounts of Hubbard's ancestry and early childhood. The accounts presented by Hubbard are portrayed as exaggerated and untrue. For example, the book contradicts Hubbard's claims that he was descended from a French Count on his mother's side; that he grew up on an immense cattle ranch owned by his grandfather in Montana; and that he became a blood brother of the Pikuni Indians before he was ten years of age.

In Chapter 2 ("Whither did he Wander?"), the book refutes Church of Scientology publication descriptions of Hubbard's teenage travels, said to have been financed by a wealthy grandfather: up and down the coast of China several times and to Tibet (where Hubbard lived with bandits who accepted him into their way of life); in western Manchuria (where he demonstrated his horsemanship to ruling warlords); to an unnamed island in the South Pacific (where he calmed the natives by exploring a cave believed to be haunted); and in the Philippines (where he learned in one night a native language known as Igoroti).

Disputed in Chapter 3 ("Explorer Manqué") are claims made in *Mission Into Time,* a Church of Scientology publication, that Hubbard: spent four years traveling in Asia; undertook the study of nuclear physics at George Washington University in one of the first courses ever taught in that subject at an American university; directed, at the age of twenty, the Caribbean Motion Picture Expedition, which provided research for the University of Michigan and underwater films for the Hydrographic Office; and led the West Indies Mineral Survey, said to be the first complete mineralogical survey of Puerto Rico. According to the book, the truth is that Hubbard traveled in China for two months in the company of his parents during the course of a year-long stay at the United States Naval Station in Guam, where his father was assigned as a naval officer; failed the

course in molecular and atomic physics at, and never graduated from, George Washington University; started out to do research in the Caribbean on an expedition that never was completed and never produced any research that could be found at the University of Michigan or the Hydrographic Office; and spent some time in Puerto Rico but produced no known record of any mineralogical research there.

Both Chapters 2 and 3 include extensive quotations from Hubbard's unpublished Asia Diaries of 1927–1929. Some of the quotations found in these chapters are set forth in Judge Leval's comprehensive opinion and order denying the injunction sought by New Era. *See* 695 F.Supp. at 1512–13. The Diaries also are quoted at some length in the Chapter 1 accounts of Hubbard's exploits as a Boy Scout. *Id.* at 1517. Seventy-three of the 132 passages from Hubbard's unpublished writings claimed by New Era as infringing are found in the Asia Diaries. Most of the remaining fifty-nine passages are taken from letters written by Hubbard.

In later chapters the book treats with Hubbard's successes as a pulp and science fiction writer, his admission to membership in the prestigious Explorers Club, his leadership of the "Alaskan Radio–Experimental Expedition" under the Club's flag, and his 1941 commission as a reserve officer in the United States Navy. It also deals with information contradicting a number of claims made by Hubbard at various times and repeated in authorized publications: that he studied savage peoples and cultures in Central America between 1938 and 1941; that he was an experienced airplane pilot; that he salvaged the careers of Boris Karloff and Bela Lugosi as a Hollywood script writer; and that he was a seriously wounded war hero who was awarded twenty-one medals, to identify only a few of the contradicted claims.

The book describes how Hubbard brought to light his new "science of Dianetics," first in an article in the magazine *Astounding Science Fiction* and then in a book entitled *Dianetics, The Modern Science of Mental Health,* which became a

bestseller. In Dianetics, Hubbard claimed to have found "[t]he hidden source of all psychosomatic ills and human aberration" and to have developed advanced techniques to cure mental and physical illnesses. The "new science" gained a large following, the "Hubbard Dianetic Research Foundation" was formed, and Hubbard developed a lucrative program for the training of auditors (practitioners) in Dianetic Techniques.

The evolution of Dianetics into Scientology and of Scientology into a religion is fully recounted in the book. As founder of the Church of Scientology, Hubbard is depicted as a charlatan and poseur whose strange religious theories and practices were designed for the financial aggrandizement of the Church, and ultimately of Hubbard himself. *See Foley v. Commissioner*, 844 F.2d 94, 95–96 (2d Cir.1988). Although Scientology attracted many adherents throughout the world, Hubbard's activities generated trouble with several governments, including the government of the United States, which challenged the Church's claim of entitlement to tax-exempt status. *See Church of Scientology of California v. Commissioner*, 823 F.2d 1310 (9th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988). Having accumulated enormous amounts of money, according to the narrative,

> [in] 1967, L. Ron Hubbard raised a private navy, appointed himself Commodore, donned a dashing uniform of his own design and set forth on an extraordinary odyssey, leading a fleet of ships across the oceans variously pursued by the CIA, the FBI, the international press and a miscellany of suspicious government and maritime agencies.

Hubbard was accompanied in his travels on the high seas by his wife, children and a number of associates and assistants. Although he resigned as President of the Church of Scientology, he continued to conduct its affairs from his base at sea.

Hubbard's surreptitious return to the United States is reported at Chapter 20 ("Running Aground") and his subsequent excursion into producing films with Scien-

tology themes is described at Chapter 21 ("Making Movies"). Also described in the latter chapter are the convictions on guilty pleas of nine Scientologists, including Hubbard's wife, for offenses involving the burglary of government offices and the theft of government documents. The book intimates that Hubbard's wife "took the rap" for a scheme that Hubbard set in motion to purge government records of matter unfavorable to him and to the Church of Scientology. Chapter 22 ("Missing, Presumed Dead") concludes the book with an account of Hubbard's mysterious demise.

The book draws extensively upon the published writings of Hubbard in Dianetics and Scientology as well as upon various bulletins Hubbard issued to his followers. Judge Leval found sixty-nine instances of the use of published material in the biography. Since he found all but three of these uses noninfringing or "fair," the opinion of the district court focuses on the use of previously unpublished materials.

### III.

### *District Court Opinion*

Applying the rule of fair use established in the copyright law, 17 U.S.C. § 107, and explicated by the Supreme Court in *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), and by this Court in *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987), to the unpublished Hubbard writings quoted in the book under examination, Judge Leval

> conclude[s] that there is a body of material of small, but more than negligible size, which, given the strong presumption against fair use of unpublished material, cannot be held to pass the fair use test

and therefore finds,

> under mandate of the *Salinger* opinion, that *Bare–Faced Messiah* to some degree infringes Hubbard's copyrights in some of his previously unpublished works.

695 F.Supp. at 1524–25.

The district court's determination is arrived at after a close examination of the

statutory fair use factors, which are seen as a means of resolving "the conflict between the justification for copying in serving the objective of public education (in the broadest sense) and the copyright owner's entitlement to reap the profits of labor and talent invested in creative works." *Id.* at 1500. Examining the nature of the copyrighted work, the second statutory fair use factor, 17 U.S.C. § 107(2), the district court opinion reflects on the Supreme Court's observation that "the scope of fair use is narrower with respect to unpublished works," *Harper & Row*, 471 U.S. at 564, 105 S.Ct. at 2232, on our interpretation that "[n]arrower 'scope' seems to refer to the diminished *likelihood* that copying will be fair use when the copyrighted material is unpublished," *Salinger*, 811 F.2d at 97, and on our pronouncement that "[unpublished] works normally enjoy complete protection against copying any protected expression," *id.* The district court, concluding that "diminished likelihood" is not the same as "impossibility" and that "normally" does not mean "inevitably," concludes that one "who purports to make a fair use of unpublished copyrighted matter must make a particularly compelling demonstration of justification, upon full consideration of the relevant fair use factors." 695 F.Supp. at 1503–04. According to the district court, Holt has made the necessary showing "[a]s to the great majority of items" by demonstrating "a powerfully compelling fair use purpose." *Id.* at 1523.

Turning to the first statutory fair use factor, the purpose and character of the use, 17 U.S.C. § 107(1), the district court opinion first reviews the overall purpose and character of the work and then addresses the fair use purposes of individual passages. As to the former, the court concludes that the biography is "a serious book of responsible historical criticism," and therefore eligible for fair use consideration despite "defendant's profit-making objective." *Id.* at 1507. As to the latter, the court finds a powerfully compelling fair use purpose in using Hubbard's own words to reveal Hubbard's character traits and the bizarre quality of his ideas.

According to the opinion, verbatim quotation is necessary to demonstrate Hubbard's dishonesty in the accounts he gave of his early life as put forward by the Church of Scientology. "It is incompatible with the ends of fair research and criticism to accuse of dishonesty without being permitted to specify what were the dishonest words." *Id.* at 1510. Specific passages must be set out, it is said, to show the subject's boastfulness, pomposity, grandiosity, pretension and self-importance, because "[i]t is the subject's conception of himself that the biographer seeks to convey." *Id.* at 1512. Hubbard's paranoia supposedly is demonstrated by certain letters and Church bulletins. The Asia Diaries are quoted "in mockery, to show Hubbard's bigotry, bias and coarse lack of taste." *Id.* at 1513. Cruelty and disloyalty are displayed in two letters having to do with a bigamous marriage, and the employment of Hubbard's words in this instance is said to "serve[ ] a strong fair use purpose." *Id.*

The book quotes from a letter written by Hubbard to the FBI accusing his estranged wife of being a communist, and from bulletins written by Hubbard urging his followers to "attack" those who oppose them, "to illustrate Hubbard's aggressiveness and vicious scheming tactics against perceived enemies." *Id.* Cynicism is illustrated by a letter to a confidant discussing Scientology's financial potential and in a lecture praising the advantages of deceit. Excerpts taken from *Dianetics: The Modern Science of Mental Health*, a Hubbard work that remains a best seller, *The History of Man*, a book establishing the foundations of Scientology, and an unpublished letter boasting of Hubbard's ability to heal are said to provide examples of derangement, insanity and bizarre pseudo-science. There is a compelling fair use purpose as to each of the excerpts, according to the opinion, because "[t]he biographer/critic should not be required simply to express ... conclusions without defending them by example." *Id.* at 1517. The opinion views with approval the lifting of various passages from earlier works "to illustrate Hubbard's egocentric self-perception in his early diaries," *id.*, and to "convey a capsule character-

ization of the style of Hubbard's earliest fiction writing," *id.* at 1518.

As to the first statutory factor, then, the opinion concludes that the "great majority" of quotations in the book demonstrate "a powerfully compelling fair use purpose that could not be accomplished without use of the subject's own words" but that "in a few instances of quotation of unpublished material," there is a "much less compelling fair use justification." *Id.* at 1520. The opinion observes that the passages involved in the "few instances" referred to "undoubtedly play a role in filling out the biographer's portrait" and may "fall short of demonstrating a sufficiently powerful claim of a fair use purpose to satisfy the test of 'narrower' scope for unpublished material." *Id.*

Examining the third statutory factor, amount and substantiality of the portion used in relation to the copyrighted work as a whole, 17 U.S.C. § 107(3), the district court finds New Era's count of 201 instances of infringement exaggerated but concludes that "there remains a substantial amount of taking of protected expression sufficient to raise a serious problem of copyright infringement if the takings are not protected by fair use." *Id.* at 1522. In the opinion of the district court the fourth statutory factor, effect of the use upon the potential market value of the copyrighted work, 17 U.S.C. § 107(4), said by the Supreme Court to be "the single most important element of fair use," *Harper & Row*, 471 U.S. at 566, 105 S.Ct. at 2233, cuts in favor of Holt. Because the book "is a hostile, critical biography using fragmentary extracts to demonstrate critical conclusions about" Hubbard, one interested in reading Hubbard's writings would not be dissuaded by the extracts from purchasing his larger works. 695 F.Supp. at 1523.

The ultimate conclusion of the opinion as to fair use is that the use of published materials is "fair" but that the book is infringing in "some degree" in respect of unpublished materials. That conclusion is arrived at with some reluctance:

As to the book overall, were it not for the ruling of the Court of Appeals in *Salinger*, I would conclude that fair use has been adequately demonstrated.... Here the demonstration of fair use is far more compelling. Many of the takings of Salinger's expression were for the purpose of enlivening that text with Salinger's expressive genius.... Hubbard's expression is taken primarily to show character flaws in a manner that cannot be accomplished without use of his words.

*Id.* at 1524. Nevertheless, the district court identifies forty-four passages from unpublished works "as to which a fair use purpose is not convincingly shown," leading it to observe: "I cannot conclude that the Court of Appeals would accord fair use protection to all of Miller's quotations, or that the biography as a whole would be considered non-infringing." *Id.*

Notwithstanding its recognition of the rule that injunctions generally are granted to prevent copyright infringement, the district court has "no difficulty concluding that this is one of those special circumstances in which the interests of free speech overwhelmingly exceed the plaintiff's interest in an injunction." *Id.* at 1528. Perceiving that *Salinger* creates a daunting obstacle to a fair use defense against the use of unpublished materials, the district court discerns a need to "focus with new intensity on the potential conflict between the copyright and freedom of speech." *Id.* at 1526. Here, according to the opinion of the district court, an injunction would suppress an interesting study of an important figure, with resultant injury to the public interest in free speech. Under such circumstances, an injunction should be denied, since "[a]n award of damages for profits ... can protect the copyright holder with far less injury to the public interest in freedom of speech than an injunction." *Id.* at 1527. The permanent injunction sought here is denied by the district court because of the prohibitive expense and waste involved in republishing after deletion of infringing passages, the public's deprivation of an important historical study and the failure of an injunction to serve any copyright interest, as well as the

significant injury to free speech. *Id.* at 1528.

## IV.

### Analysis

We agree that a permanent injunction should be denied, but for a reason wholly different from any of those set forth in the district court's opinion. Moreover, we disagree with a great deal of what is said in the opinion.

■ First, we do not share some of the district court's views respecting the proper application of the four fair use factors in this case. It seems clear to us that the first statutory fair use factor, purpose of the use, weighs in favor of Holt, while the remaining three factors, nature of the copyrighted work, amount and substantiality of the portion used, and effect of the use upon the market, all weigh in favor of New Era. The book under examination here is no different from the *Salinger* biography in its statutory fair use purpose classification: "criticism," "scholarship" or "research." *See Salinger*, 811 F.2d at 96. Consonant with *Salinger*, "we agree with the District Court that the first fair use factor weighs in [Holt's] favor, but not that the purpose of [its] use entitles [it] to any special consideration." *Id.* at 97. The tenor of the district court opinion is that special consideration should be afforded to Holt, to the extent that Hubbard's words are quoted to prove some traits of character either at odds with his public image or especially intriguing to the reader. The district court sees a significant distinction in purpose between the use of an author's words to display the distinctiveness of his writing style and the use of an author's words to make a point about his character, finding far greater justification in the latter than in the former. We find such a distinction unnecessary and unwarranted in applying the statutory fair use purpose factor. As long as a book can be classified as a work of criticism, scholarship or research, as can the book here, the factor cuts in favor of the book's publisher, whether the copyrighted matter is taken

from a literary lion like J.D. Salinger or a purported prophet like L. Ron Hubbard.

■ The district court opinion adds a gloss to the second fair use factor—nature of the copyrighted work—that we think should be removed. While we made it clear in *Salinger* that unpublished works normally enjoy complete protection, the district court would parse this factor also with a distinction. In this instance the distinction is between the use of protected expression to "enliven" text and the use of protected expression to communicate "significant points" about the subject. We see no need for such an approach. Where use is made of materials of an "unpublished nature," the second fair use factor has yet to be applied in favor of an infringer, and we do not do so here. "Since the copyrighted letters are unpublished, the second factor weighs heavily in favor of [New Era]." *Id.*

We agree with the district court's analysis of the third fair use factor and with its finding that a substantial amount of taking remains even after correcting for New Era's overcounting. Our analysis of the fourth fair use factor, effect of the copyrighted work, differs substantially from that of the district court. Since the district court accepted New Era's contention that it would commission an authorized biography of Hubbard and that all Hubbard's writings, published and unpublished, would be made available for that purpose, it is difficult to conclude, as does the district court, that the book published by Holt would have no effect on the market for New Era's forthcoming book. We disagree with Judge Leval on the application of the fourth fair use factor, as we did in *Salinger*, finding here as we did there that "some impairment of the market seems likely" and that "[t]he fourth fair use factor weighs slightly in [the copyright owner's] favor." *Id.* at 99.

■ Following an exhaustive analysis of the doctrine of fair use, the district court finds in any event that a small, but more than negligible, body of unpublished material cannot pass the fair use test, given the strong presumption against fair use of unpublished work. Although we would char-

acterize the use here as more than "small," it makes no difference insofar as entitlement to injunctive relief is concerned. Since the copying of "more than minimal amounts" of unpublished expressive material calls for an injunction barring the unauthorized use, *id.* at 96, the consequences of the district court's findings seem obvious. Nevertheless, the district court denied an injunction for several reasons, one being the existence of special circumstances in which free speech interests were said to outweigh the interests of the copyright owner. We are not persuaded, however, that any first amendment concerns not accommodated by the Copyright Act are implicated in this action. Our observation that the fair use doctrine encompasses all claims of first amendment in the copyright field, *Roy Export Co. Establishment v. Columbia Broadcasting System, Inc.*, 672 F.2d 1095, 1099–100 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), never has been repudiated. *See, e.g., Harper and Row*, 471 U.S. at 557, 105 S.Ct. at 2229. An author's expression of an idea, as distinguished from the idea itself, is not considered subject to the public's "right to know." W. Patry, The Fair Use Privilege in Copyright Law 466 (1985).

Nor are we persuaded by any of the other reasons given by the district court for denying an injunction following its rejection of the fair use defense and its finding of infringement. The public would not necessarily be deprived of an "interesting and valuable historical study," 695 F.Supp. at 1528, but only of an infringing one. The "prohibitive" expense of republication after deletion of improperly included material is without more an inevitable consequence of breach of copyright, and, contrary to the view of the district court, a "significant copyright interest" certainly would be served by an injunction. The Copyright Act is, after all, a device for carrying into effect a Congressional power firmly embedded in our Constitution—"To promote the ... useful Arts, by securing for limited Times to Authors ... the exclusive Right to their respective Writings ...." U.S. Const. Art. I, Sec. 8.

■ Nevertheless, equitable considerations dictate denial of injunctive relief in this action. The prejudice suffered by Holt as the result of New Era's unreasonable and inexcusable delay in bringing the action invokes the bar of laches. *See Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 804 (8th Cir.1979), *cert. denied*, 446 U.S. 913, 100 S.Ct. 1844, 64 L.Ed.2d 267 (1980). In initially denying a temporary restraining order, the district court found that New Era had been aware since 1986 that the book would be published in the United States. Despite this knowledge, and despite lawsuits commenced in 1987 to enjoin publication in England, Canada and Australia, New Era failed to compare Holt's book with the books published abroad; failed to inquire of Holt as to the planned date of publication in this country; and failed to take any steps to enjoin publication of the book until it sought a restraining order in May of 1988. At the time of the TRO application, 12,000 copies of the book already had been printed, packed and (except for 3,000 copies left on a loading dock) shipped. Review copies had been sent out and a second press run was scheduled for May 6. The district court, in its opinion denying the TRO, commented on the delay and the prejudicial nature of the delay:

> [Holt] had made clear since Mr. Rintoul's defiant letter in the summer of 1986 that it had no interest either in cooperating with [New Era] or in entering into discussions of infringements. There is no good reason why [New Era] should have waited until May [1988] to seek provisional orders of restraint. An earlier application would have permitted the court to explore the issues of law without causing [Holt] catastrophic harm.

684 F.Supp. at 810.

If New Era promptly had sought an adjudication of its rights, the book might have been changed at minimal cost while there still was an opportunity to do so. At this point, however, it appears that a permanent injunction would result in the total destruction of the work since it is not economically feasible to reprint the book after deletion of the infringing material. 695

F.Supp. at 1528. Such severe prejudice, coupled with the unconscionable delay already described, mandates denial of the injunction for laches and relegation of New Era to its damages remedy. *See West Pub. Co. v. Edward Thompson Co.*, 176 F. 833, 838 (2d Cir.1910); *Hayden v. Chalfant Press, Inc.*, 177 F.Supp. 303, 307 (S.D.Cal. 1959), *aff'd*, 281 F.2d 543 (9th Cir.1960); *Blackburn v. Southern California Gas Co.*, 14 F.Supp. 553, 554 (S.D.Cal.1936).

### Epilogue

The judgment of the district court is affirmed. The stay heretofore granted by this Court is vacated. The mandate shall issue forthwith.

OAKES, Chief Judge (concurring):

While I agree that the denial of an injunction should be affirmed and hence concur, it seems to me unnecessary for the majority opinion to do anything other than affirm the denial of an injunction for laches (even though I would only remand were that the only issue). While I do not completely agree with Judge Leval's fair use analysis, it seems to me the majority unnecessarily goes out of its way to take issue with Judge Leval's opinion, *New Era Publications Int'l, ApS v. Henry Holt and Co.*, 695 F.Supp. 1493 (S.D.N.Y.1988). Doing so, even by way of dictum, tends to cast in concrete *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987). *Salinger* is a decision which, even if rightly decided on its facts, involved underlying, if latent, privacy implications not present here by virtue of Hubbard's death. *Salinger*'s language, as here applied, confines the concept of fair use and prevents necessary flexibility in fashioning equitable remedies in copyright cases. I thought that *Salinger* might by being taken literally in another factual context come back to haunt us. This case realizes that concern. 'Tis the more the pity, since the majority's "disagree[ment] with a great deal of [Judge Leval's] opinion," majority op. at 583, can in a real sense be considered dictum.

Ordinarily, in the interests of brevity I would confine this concurrence to my points of disagreement with the majority, relegating to an appendix my very limited disagreement with Judge Leval on his fair use analysis. But because "[f]air use is a mixed question of law and fact," *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 560, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985), I must restate a certain amount of background information.

### I.  Background

The book, *Bare–Faced Messiah*, is a biography of sorts, largely based upon Freedom of Information Act materials from U.S. Navy, Federal Bureau of Investigation, Central Intelligence Agency and other United States agency records; numerous interviews with Scientologists, friends, enemies, and relatives of Hubbard; newspaper stories and published materials about the man; Hubbard's own extensive writings, involving literally millions of words, published and unpublished; and court records and testimony in various tax, bankruptcy, divorce, and other proceedings. Like Judge Leval, I believe it unnecessary to assess the accuracy of Miller's reports or the justification for his conclusions. Nonetheless, there is no reason, and I do not see the majority doing otherwise, to quarrel with the judge's finding that the book "appears to make responsible use of its material" and hence is "a serious work of criticism and comment on a highly newsworthy subject." 695 F.Supp. at 1506. As such, it is properly qualified for fair use consideration as a work of "criticism, comment, news reporting, teaching ..., scholarship, or research," under 17 U.S.C. § 107.

It bears mention that *Messiah* gives due credit in the preface to a dedicated member of the Church of Scientology for more than a decade, one Gerry Armstrong, who, when given permission to research an official biography of Hubbard, is said to have gone through six filing cabinets of material, only to become totally disillusioned with contradictory material on Hubbard's family background, naval and academic careers, fraudulent business background, tax evasion and

evasion of the law. Armstrong, who was unsuccessfully sued by the Church, *Church of Scientology of California v. Armstrong,* No. C. 420153 (Super.Ct.Cal. June 20, 1984), is quoted as concluding that Hubbard was "a con man." *Messiah* at 6.

## II. Judge Leval's Opinion

For examples of *Messiah*'s use of copyrighted material, I would refer the reader to Judge Leval's comprehensive analysis of New Era's claims. *See* 695 F.Supp. at 1507–22. A long appendix to the judge's opinion provides all of the passages in *Messiah* which New Era claims infringed its copyright, the sources of those passages, and the judge's rulings on each passage. The appendix itself was not published in the Federal Supplement, and although I will refer to the appendix occasionally, I do not consider it necessary to publish it here.

The first twenty-two pages of the Leval appendix catalog sixty-nine quotations or references to published materials. Of these, with only three exceptions,[1] the judge found either that there was no infringement because the quotations merely reported facts or ideas and the paraphrases did not use Hubbard's manner of expression, or that there was a strong fair use justification. Fair use was justified, Judge Leval said, because some of these passages embodied false mythology about Hubbard; Hubbard's dishonesty; his boastfulness, pomposity, or pretension; his paranoia; his snobbery, bigotry, disdain for Asians, or dislike of the Orient; his cruelty or disloyalty; his aggressiveness, viciousness, or scheming tactics; his cynicism; or his de-

rangement, insanity, or bizarre pseudo-science. Judge Leval found that other passages were necessary to render Hubbard's ideas accurately or to display his early writing style or presentation of himself. Judge Leval considered all of these reasons for quoting Hubbard directly because they have bearing on "the purpose and character of the use." 17 U.S.C. § 107(1). In setting forth these different categories of fair use, Judge Leval referred to the statute, which permits use *"for purposes such as* criticism, comment, news reporting, teaching ..., scholarship, or research." *Id.* § 107 (emphasis added to show statutory terms not all inclusive); *see* 695 F.Supp. at 1505. The opinion also notes that "[a]lthough plaintiff does not concede justification for the quotations from the previously published works, it no doubt recognizes that defendant's claims of fair use as to those materials are extremely powerful." 695 F.Supp. at 1498. New Era's fire on appeal is not directed at Judge Leval's findings on the published material, but its brief does mention that fair use does not extend to multiple, excessive, or less important illustrations of Hubbard's characteristics, as Judge Leval's opinion itself recognized. *See id.* at 1524. New Era does not, however, support this suggestion with specific examples.

This appeal instead concerns quotations from the *unpublished* Hubbard writings. Judge Leval's appendix lists 132 passages from unpublished works which New Era claims infringed its copyright. Seventy-three of these came from Hubbard's Asia Diaries written in 1927–29, when Hubbard was a young man. Most of the Asia Dia-

---

**1.** The three exceptions, where quotations of Hubbard's published writings were found to be not fairly used, are de minimis or insignificant under the other fair use factors such as marketability. *Warner Bros., Inc. v. American Broadcasting Cos.,* 720 F.2d 231, 242 (2d Cir.1983); *Time Inc. v. Bernard Geis Assocs.,* 293 F.Supp. 130, 146 (S.D.N.Y.1968); *Meredith Corp. v. Harper & Row, Publishers, Inc.,* 378 F.Supp. 686, 689 (S.D.N.Y.), *aff'd,* 500 F.2d 1221 (2d Cir.1974). (Judge Leval did not refer directly to these three passages, but presumably he too thought that they were de minimis.) The first two passages are from a 1960 Hubbard Communications Office Bulletin, the first quoting the clause "a person named Richard M. Nixon" and the sec-

ond reading as follows: "We want clean hands in public office in the United States. Let's begin doggedly denying Nixon the presidency no matter what his Secret Service tries to do to us now. . . . He hates us and has used what police force was available to him to say so. So please get busy on it." The third consists of two sentences quoted from Hubbard's book, *Mission Into Time:* "Hearing of L. Ron Hubbard's plans for further exploration and research into, among other things, past civilizations, many Scientologists wanted to join him and help. They adopted the name 'Sea Organization.'" With respect to Judge Leval, much of this last quotation could well have been treated as noninfringing because it involves fact.

ries passages quoted appear in chapters 2 and 3 of *Messiah*. Most of the remaining fifty-nine passages from unpublished works came from letters: Six were in one letter (to his first wife) dated July 21, 1939; twelve were in four letters to a follower, Helen O'Brien; one was in an internal memo to a press officer; two were in a letter (apparently dated 1971) to his daughter Alexis disavowing that he was her father; and the rest were in letters sent to the Secretary of War offering Hubbard's services in World War II, to the FBI (mainly deprecating his second wife), to the VA seeking to upgrade his World War II pension, to an Alaskan bank cashier explaining why Hubbard had not paid a note, and to the FBI or the President of the United States seeking to ingratiate himself or Scientology. There is also a quotation from Hubbard's proposed Constitution for the Nation of Rhodesia and a paraphrase of a dispatch to Hubbard's Scientology followers at Saint Hill, England.

Judge Leval found that 91 of the 132 passages from unpublished works were fairly used or did not infringe upon the unpublished Hubbard writings and that the remaining 41 were unfairly used. *The Asia Diaries were the source of all but four of those unfairly used passages.* Set out in the margin is a table which summarizes *Messiah*'s use of Hubbard's writing and Judge Leval's findings.[2]

Judge Leval's principal conclusions on the unpublished works may be summarized as follows:

1. *The first conclusion.* *Harper & Row, supra,* and *Salinger, supra,* do not preclude a finding of fair use as to unpublished materials, but they do argue strongly against it and place a burden on the user to "establish a highly convincing case in favor of fair use." 695 F.Supp. at 1523. With this the majority cannot and does not disagree.

2. *The second conclusion.* Holt met its burden in this case as to the great majority of unpublished materials. *Salinger* and Judge Leval's own *Craft v. Kobler,* 667 F.Supp. 120 (S.D.N.Y.1987), cases in which the biographer "has used the lively expression of his subject to enliven the biography," 695 F.Supp. at 1523, can be distinguished from this case, where the personal traits of Hubbard could not be shown without using the subject's own words, because the value of the passages quoted in *Messiah* "lies precisely in the subject's choice of words—not as a matter of literary expression—but for what the choice of words reveals about the subject." *Id.* at 1524. A prime example is the quotation from Hubbard's Asia Diaries: "The trouble with China is, there are too many chinks here."[3] The majority apparently rejects this approach of Judge Leval; if the work is unpublished the majority considers under the second fair use test—the nature of the unpublished work—that protection follows as of course. Majority op. at 583. I disagree.

3. *The third conclusion.* As to the book overall, Judge Leval found that fair use was adequately demonstrated, far

2. Summary of *Bare-Faced Messiah*'s use of published and unpublished materials and of Judge Leval's findings

| | Noninfringement or fair use found by Judge Leval | Unfair use found by Judge Leval | Totals |
|---|---|---|---|
| Use of published materials | 66 | 3 | 69 |
| Use of unpublished materials | 91 | 41 | 132 |
| (of which: from Asia Diaries) | (36) | (37) | (73) |
| Totals | 157 | 44 | 201 |

3. [A]s to Hubbard's sentence, "The trouble with China is, there are too many Chinks here," there is no fact reported in it which the biographer has an interest in narrating. What is interesting is that Hubbard said it.

Nor should a biographer/critic be limited to stating her conclusions about the subject's choice of words. It would be preposterous to restrict Miller to writing something like, "Hubbard used a vulgar derogatory epithet exhibiting snobbish bigoted disdain for the Chinese." That would be at once unfair to the biographer, the subject, and the readership, which can reasonably demand to know "What did he say? Let us be the judge of whether it was vulgar, snobbish or bigoted."

695 F.Supp. at 1524 (citation omitted).

more compelling than in *Salinger* (which reversed Judge Leval's district court opinion, *Salinger v. Random House, Inc.*, 650 F.Supp. 413 (S.D.N.Y.1986)). But, given *Salinger*, and its strong presumption against finding fair use for unpublished materials, Judge Leval went on to concede, perhaps *Messiah* uses too many examples or in some cases insufficiently effective or important ones to demonstrate Hubbard's characteristics. This required a finding of "some degree" of infringement. 695 F.Supp. at 1524–25. The majority agrees though saying that the use here was "more than 'small.'" Majority op. at 583. I totally disagree. Out of the millions of Hubbard's words the use was infinitesimal. In comparison to *Messiah* as a whole, the unfair use was tiny, indeed insignificant.

4. *The fourth conclusion.* While an injunction ordinarily issues to prevent copyright infringement, Judge Leval found this case "drastically different," since (1) *Messiah* was not an example of "profiteering by appropriating the creative effort and genius of another" or other "opportunistic free riding"; (2) the infringing portions are "insignificant"; and (3) an injunction would "diminish public knowledge," so First Amendment concerns are implicated. *Id.* at 1525. Therefore, Judge Leval concluded, all of the circumstances of this case required the denial of a permanent injunction. The majority disagrees. Majority op. at 584–585.[4] I totally disagree with the majority.

## III. Discussion

### A. Fair Use Doctrine

I need not here review the background of the defense of fair use. There is a very good book on the subject, one that has been cited by the United States Supreme Court and is referred to by the majority. *See* W. Patry, *The Fair Use Privilege in Copyright Law* (1985) (hereinafter Patry); *Harper & Row*, 471 U.S. at 554, 105 S.Ct. at 2227. The leading treatise covers the fair use defense in depth. *See* 3 *Nimmer on Copyright* § 13.05, at 13–62.4 to –129 (1988) (hereinafter *Nimmer*). The Copyright Act itself lists four non-exclusive factors—I emphasize non-exclusive—to consider in this inquiry. These include, of course, the purpose and character of the use, the nature of the copyrighted work, the amount and substantiality of the portion used in relation to the copyrighted

---

**4.** I note that Judge Leval, in so holding, declined to rely on two factors alluded to in the briefs on appeal. First, Judge Leval did not rely on the fact that most of the unpublished materials here at issue—including the Asia Diaries—became part of a court record and in that sense were published in the California Superior Court litigation in which the Church sought to recover them from its member Armstrong who it claimed had taken them without permission. Judge Leval decided that any display of those materials in the California litigation was over the Church's objection and that, as a matter of principle, being forced to sacrifice a right in order to bring a lawsuit to enforce it would make the right chimerical. 695 F.Supp. at 1500 n. 3. An uncontroverted affidavit in the record provides further support for Judge Leval's position: for all practical purposes the documents in the California case were at almost all times under seal, subject to court order, not copied and ultimately returned to the Church after the settlement of Armstrong's cross-claim against the Church.

Second, Judge Leval did not rely on the fact that, as New Era argued in the district court, the private nature of the Hubbard documents should favor a finding of infringement. He pointed out that "the protection of privacy is not

the function of our copyright law." *Id.* at 1504. While an action under state law for a violation of the right of privacy is not preempted by the Copyright Act, such a right is not available once the subject of the publication is deceased, particularly where the writer was a public figure like Hubbard. *Id.* Case law supports Judge Leval's view that a person's privacy right terminates at death. *Cordell v. Detective Publication, Inc.*, 419 F.2d 989, 990–91 (6th Cir.1969); *Maritote v. Desilu Productions, Inc.*, 345 F.2d 418, 419 (7th Cir.), *cert. denied*, 382 U.S. 883, 86 S.Ct. 176, 15 L.Ed.2d 124 (1965); *United States v. Amalgamated Life Ins. Co.*, 534 F.Supp. 676, 679 (S.D.N.Y.1982); *Meeropol v. Nizer*, 381 F.Supp. 29, 37 (S.D.N.Y.1974); *aff'd in relevant part*, 560 F.2d 1061 (2d Cir.1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978).

If, as some commentators have suggested, e.g., Note, *Fair Use of Unpublished Materials in the Second Circuit: The Letters of the Law*, 54 Brooklyn L.Rev. 417, 457–60 (1988), tacit concerns for Salinger's privacy in some way informed the *Salinger* opinion, those concerns are not present here. On privacy and the law of copyright, see Judge Newman's informative Manges lecture, in 12 Colum.–VLA J.L. & Arts 459, 460 n. 2 (1988), refuting the commentators' suggestion.

work as a whole, and the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107 (1982). Section 107 requires a case-by-case determination whether a particular use is fair. *Harper & Row,* 471 U.S. at 549, 105 S.Ct. at 2224–25. Fair use is an "equitable rule of reason." *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 448 & n. 31, 104 S.Ct. 774, 792 & n. 31, 78 L.Ed.2d 574 (1984) (quoting from H.R.Rep. No. 94–1476, at 65 (1976)); *see also Harper & Row,* 471 U.S. at 551, 105 S.Ct. at 2226 (emphasizing the "equitable nature" of the fair use doctrine). The doctrine "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." 471 U.S. at 550 n. 3, 105 S.Ct. at 2225 n. 3 (quoting *Iowa State Univ. Research Found., Inc. v. American Broadcasting Cos.,* 621 F.2d 57, 60 (2d Cir.1980)).

Because *Salinger* is not the beginning and the end of fair use law, previous Second Circuit cases involving biographies, public figures and public information do, I think, need reference. *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303 (2d Cir.1966), *rev'g* 256 F.Supp. 55 (S.D.N.Y.), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967), involved a biography of Howard Hughes and allegations that Hughes was attempting to suppress unfavorable publicity. After learning that Random House was considering publication of a biography, Hughes granted a friendly Nevada corporation, Rosemont Enterprises, Inc., an exclusive contract to publish and sell his authorized biography,

Rosemont then purchased the copyrights to articles about Hughes that had appeared in *Look* magazine in 1954. After Random House published its biography, Rosemont brought suit for the infringement of the *Look* articles, claiming that the *Look* articles were copied at least forty-one times. 256 F.Supp. at 61. The district court found that the taking was substantial in quantity and quality and granted a preliminary injunction. *Id.* at 64, 68. This court reversed in an opinion by Judge Moore:

> Whether the privilege may justifiably be applied to particular materials turns initially on the nature of the materials, e.g., whether their distribution would serve the public interest in the free dissemination of information and whether their preparation requires some use of prior materials dealing with the same subject matter.

366 F.2d at 307. That is to say, the second use must serve the public interest and must require use of the original work. *Cf. Marvin Worth Prods. v. Superior Films Corp.,* 319 F.Supp. 1269, 1275 (S.D.N.Y. 1970) (film did not need to use books on life of Lenny Bruce, and use did not serve public interest; *Rosemont* distinguished).[5]

*Time Inc. v. Bernard Geis Associates,* 293 F.Supp. 130 (S.D.N.Y.1968), involved the famous Zapruder film of the assassination of President Kennedy. A book published by Bernard Geis Associates, *Six Seconds in Dallas,* used charcoal sketches of the Zapruder frames, then owned by *Life* magazine, which had improperly been photographed by a *Life* employee who wrote the book. The district court emphasized the strong public interest in making avail-

---

**5.** Mention should also be made of the "concurring" opinion in *Rosemont* of Chief Judge Lumbard—an opinion joined by Judge Hays—which looked to the equitable doctrine of clean hands in light of Hughes' alleged attempt to suppress unfavorable biographies, 366 F.2d at 311–13.

Judge Leval did not consider the doctrine of unclean hands, though the English trial court which denied an interim injunction sought by the Church of Scientology against *Messiah*'s author and Penguin Books said that the Church's litigation was "oppressive" and "not *bona fide* launched to protect any legitimate interest of the church in preserving confidentiality in information contained in Mr. Miller's biography."

*Church of Scientology of California v. Miller,* slip op. at 16 (Ch. Oct. 9, 1987), *aff'd,* Ch. 1986 C. No. 6140 (C.A. Oct. 22, 1987). Were appellants to have prevailed on this appeal, the allegations presented in the affidavit of W. Mallory Rintoul, Esq., the Secretary and General Counsel of Henry Holt and Company, Inc., in the joint appendix at 883 with attached materials, would in my opinion have called for an examination of the "clean hands" of appellants. This, like the majority's consideration of laches, necessarily follows from the fact that New Era sought injunctive relief; these are *equitable* defenses to an *equitable* remedy, sought in connection with an *equitable* doctrine.

able the fullest information about the murder of President Kennedy, 293 F.Supp. at 146, but may not have properly evaluated the potential economic harm to the owner of the copyright in granting summary judgment to the defendants, *see* Patry at 98–100.

*Meeropol v. Nizer* was a series of cases brought by the sons of Ethel and Julius Rosenberg to restrain Louis Nizer's book, *The Implosion Conspiracy.* In the first *Meeropol v. Nizer*, 361 F.Supp. 1063 (S.D. N.Y.1973), Judge Tyler denied a motion to restrain Nizer pendente lite from infringing upon a claimed copyright in the Rosenbergs' letters which had been published in a 1953 book, but which had been out of print for nearly twenty years. The court cited *Rosemont*'s public interest and necessity tests. *Id.* at 1067–68. It found a continuing public interest in the Rosenberg case, that the letters were important to any serious book on the subject, and that the selections from the letters were used "with discretion and with demonstrable purpose to illustrate, from an historical and legal point of view, the post-conviction appeals and petitions for clemency which were filed by and for Mr. and Mrs. Rosenberg." *Id.* at 1068. An appeal was taken, but apparently dropped, *see Meeropol v. Nizer*, 417 F.Supp. 1201, 1203 n. 1 (S.D.N.Y.1976), *aff'd in part, rev'd in part*, 560 F.2d 1061 (2d Cir.1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978).

On an expanded record in 1976, the Meeropols' supplemental complaint was heard on a motion by defendants for summary judgment. *Id.* at 1203. Judge Gagliardi held, not altogether persuasively to some, *see* Patry at 79–80:

> [C]ourts in recent years have come to recognize that there are occasionally situations in which the copyright holder's interest in a maximum financial return must occasionally be subordinated to the greater public interest in the development of arts, science, and industry.

417 F.Supp. at 1206. Our court reversed, finding that fair use was not established as a matter of law and that genuine issues of fact existed which precluded summary judgment. These issues were the purposes for which Nizer used quotations from the Rosenberg letters and the effect of that use upon the future market for the letters. 560 F.2d 1061, 1070 (2d Cir.1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed. 2d 756 (1978). Judge Smith's opinion for this court stated that the inquiry on remand should determine "whether or not the Rosenberg letters were used primarily for scholarly, historical reasons or predominantly for commercial exploitation." *Id.* at 1069. The key issue was "whether the defendant's work tends to diminish or prejudice the potential sale of plaintiff's work." *Id.* at 1070 (fact that letters quoted were out of print "does not necessarily mean that they have no future market which can be injured"). Thus, *Meeropol* qualified *Rosemont* to a certain extent, and it cannot be overlooked in the analysis that follows.

*Iowa State University Research Foundation, Inc. v. American Broadcasting Cos.*, 621 F.2d 57 (2d Cir.1980), involved ABC's use in its coverage of the 1972 Olympics of two-and-one-half minutes of film from a twenty-eight-minute biographical film about a wrestler at Iowa State who ultimately won a gold medal. In affirming the opinion of Judge Lumbard, sitting as a district judge, 463 F.Supp. 902 (S.D.N.Y. 1978), the Court of Appeals said that "[t]he fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance." In this regard, it was relevant that the copyrighted material was used for commercial purposes. 621 F.2d at 61. The *Iowa State* court also rejected a purely quantitative approach for determining whether the copying is insignificant, *id.* at 61–62, a factor which I also consider important.

Finally, in *Roy Export Co. Establishment v. Columbia Broadcasting System, Inc.*, 672 F.2d 1095 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), this court rejected a news broadcaster's claim that it had a First Amendment right to use portions of Charlie Chaplin's films in the broadcast coverage of Chaplin's death. Judge Newman's opinion

for the court quoted *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 95 (2d Cir.1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978), as stating the general rule that " '[c]onflicts between interests protected by the first amendment and the copyright laws thus far have been resolved by application of the fair use doctrine.' " 672 F.2d at 1100.

In sum, before *Salinger* the Second Circuit recognized that public interest in the subject matter and the necessity for the use are important components of fair use, and that the fair use doctrine is an appropriate way to resolve conflicts between copyright law and the First Amendment. At the same time, the commercial motives of a user will count against fair use, and so will the likelihood of undermining the market for the protected work. A court should consider the use in both quantitative and qualitative terms. Following the Supreme Court's decision in *Harper & Row*, more attention has been given to the additional issue of how significant it is that the material copied was unpublished.

### B. Fair Use in *Messiah*

Neither appellant nor the majority opinion disputes Judge Leval's conclusion about Hubbard's published works: that all the quotations or paraphrases from these works were either non-infringing or fairly used (or implicitly de minimis, *see* note 1 *supra*).[6] Rather, New Era's principal argument and the majority opinion concern Hubbard's unpublished writings. The claim is that Judge Leval's conclusion that

the fair use doctrine justifies Holt's use of portions of these writings is contrary to *Harper & Row* and "eviscerates" *Salinger.* The majority agrees with New Era (majority op. at 583) that the district court's consideration of the first section 107 factor—the purpose and character of the use—is premised on an illusory distinction between quotations used merely to "enliven" a biographer's work and quotations that are essential to communicate significant points about the character of the subject. Judge Leval, the argument runs, improperly thought that it was necessary to quote Hubbard to communicate character traits such as dishonesty, boastfulness, pretention, and the like.

It is true that *Salinger* said that a "biographer has no inherent right to copy the 'accuracy' or the 'vividness' of the letter writer's expression. Indeed, 'vividness of expression' is precisely an attribute of the author's expression that he is entitled to protect." 811 F.2d at 96. *Salinger* goes on to quote the defendant in that case as stating, when asked why he copied a stylistic device of Salinger's, that he wanted to convey the fact that Salinger was adopting an ironic tone. The biographer was then asked whether he could have stated that Salinger had an ironic tone; he responded that " '[t]hat would make a pedestrian sentence I didn't wish to put my name to.' " *Id.* Judge Newman, writing for the *Salinger* panel, concluded: "[W]hen dealing with copyrighted expression, a biographer (or any other copier) may frequently have to content himself with reporting only the fact of what his subject did, even if he

---

**6.** New Era does question—the majority does not —whether letters filed with various government agencies or applications thereto should be considered published, since Hubbard sent them to the agencies before the Freedom of Information Act was adopted. Holt argues, on the other hand, that Hubbard's letter or applications to government agencies were published.

I think that Holt has the better of the argument. While before the FOIA the letters may have been sent with an expectation of privacy, that expectation no longer existed after Hubbard's death. Moreover, publication occurred in a very real sense when Hubbard wrote the government agency or official in question. *Cf. Restatement (Second) of Torts* § 577 (1977)

(publication of defamatory material). Finally, the FOIA does not apply only to materials that arrived in government files after its enactment.

To be sure, the act of placing a "work" in a public file where it is available for inspection is not a publication under 17 U.S.C. § 101, at least after January 1, 1978, 1 *Nimmer* §§ 4.07, at 4–39 to –40, 4.10 at 4–49 and cases cited, because the work has not been distributed. Nonetheless, although case law on this is nonexistent, I think that letters or applications to government agencies seeking or promoting action by the agencies are not "works of authorship" in the copyright sense of 17 U.S.C. § 102. *Cf. id.* § 2.03[A], at 2–24 (Congress did not use its full constitutional powers over "writings" in the Act).

thereby pens a 'pedestrian' sentence. The copier is not at liberty to avoid 'pedestrian' reportage by appropriating his subject's literary devices." *Id.* at 96–97. While this passage could be read broadly, as apparently the majority does, I do not think that it reaches the case where the biographer or critic is using the protected expression as a fact to prove a character trait that is at odds with the public image that the subject or the subject's supporters have attempted to project. As Judge Leval said, it may be "the *words used* by [a] public figure (or the particular manner of expression) that are the facts calling for comment." 695 F.Supp. at 1502. This is entirely consistent with the Supreme Court's comment in *Harper & Row* that quotations may be "necessary adequately to convey the facts." In that case, for example, President Ford's characterization of certain White House tapes as the "smoking gun" was "perhaps so integral to the idea expressed as to be inseparable from it." 471 U.S. at 563, 105 S.Ct. at 2232.

I agree with Judge Leval: words that are facts calling for comment are distinguishable from words that simply enliven text. The law recognizes that words themselves may be facts to be proven. For example, in evidence law, words of independent legal significance, such as a contract or slander, are verbal acts and not hearsay. *See McCormick on Evidence* § 249, at 732–33 (3d ed. 1984). According to *Messiah*, Hubbard lied, boasted, etc. These are *actions*. In order to prove his point, *Messiah*'s author must recount those actions—i.e., he must quote Hubbard's lies, boasts, etc. Thus, in *Salinger*'s words, *see* 811 F.2d at 97, *Messiah* seeks, in quoting Hubbard's writings, to "report[ ] only the fact of what [Hubbard] did."

Judge Leval offers a colorful hypothetical to support this argument: a popular, benign mayor who has sent memoranda to opponents in various conflicts threatening to "cut your heart out," "castrate you," and "bust your kneecaps." 695 F.Supp. at 1502. A journalist questioning the accuracy of the mayor's public image might well quote from these memoranda since it would be very difficult, if not impossible, to convey the fact that the mayor was not the benign character he was thought to be without these particular words or expressions. Another of Judge Leval's examples fits the *Messiah* quotations quite closely: A religious leader renowned for his selfless kindness, liberality of spirit and sympathy for the sufferings of others might well be exposed by extracts from his letters and journals which displayed greed or callous indifference and employed the language of racial and religious bigotry. *Id.* Thus, in considering the first of the factors identified by Congress and the courts—the purpose and character of the use—unlike the majority, I think the district court made an appropriate distinction between this case and *Salinger*.

There are a few quotations which I nevertheless concede are indistinguishable from those held to be improper in *Salinger*, and here I part company—but only a little—from Judge Leval. There are, for example, quotations from eight passages in short-story outlines and drafts to show Hubbard's teenage style of writing. The district court thought that these quotations could properly be used. *Salinger* makes it very clear, however, that quotations used merely to demonstrate writing style may not qualify for the fair use defense. 811 F.2d at 96–97. Quotations from those eight passages, then, are not fairly used. Nevertheless, they do not—unlike the quotations from Salinger's letters—"make the book worth reading." *Id.* at 99. Rather, they serve only in a very limited way as background information. The majority opinion disregards this distinction.

As to the second factor, the nature of the copyrighted work, *Harper & Row* says that "the scope of fair use is narrower with respect to unpublished works" because "the author's right to control the first public appearance of his expression weighs against such use of the work before its release." Thus, the fact that a work is unpublished is a "critical element of its 'nature.'" 471 U.S. at 564, 105 S.Ct. at 2232.

*Salinger* interpreted narrower "scope" to refer to the "diminished likelihood that

copying will be fair use when the copyrighted material is unpublished," on the theory that these passages in *Harper & Row* convey the idea that unpublished works normally enjoy complete protection against copying. 811 F.2d at 97. I accept this as the holding of *Salinger,* which we are bound to follow absent en banc review, even though *Salinger* itself recognized that at least one other interpretation might be given to the Supreme Court's statements in *Harper & Row*: the Court might have meant that lesser amounts of copyrighted material can be copied from unpublished works than from published works. Nevertheless, I do not think that *Harper & Row,* as glossed by *Salinger,* leads to the inevitable conclusion that all copying from unpublished work is per se infringement. By referring to a diminished "likelihood," *Salinger* suggests that there may be some instances—even though less likely—where copying will be fair use. For the Supreme Court in *Harper & Row* to say that "the scope of fair use is narrower" was quite different from saying that there is no scope at all. Furthermore, when *Harper & Row* said that the unpublished nature of a work should be a "key, though not necessarily determinative, factor" in fair use analysis, 471 U.S. at 554, 105 S.Ct. at 2227 (quoting S.Rep. No. 94-473, at 64 (1975)), it implicitly renounced a per se rule. Indeed, the statute itself does not distinguish between published and unpublished works.

The second factor, as I see it, helps to define the burden that is placed upon a defendant to justify its use of copyrighted material. Holt must justify its use more convincingly under section 107's other factors when quoting from Hubbard's unpublished writings than when quoting from his published works. *See* 695 F.Supp. at 1504.

The third factor is the amount and substantiality of the portion of the copyrighted work used. Paraphrase as well as actual quotation must be considered. *Salinger,* 811 F.2d at 97–98. We must also examine the amount and substantiality of the passages at issue both in relation to the protected work and in relation to the work accused of infringement. *Salinger* found

that the Hamilton biography there involved copied a considerable amount from forty-four letters by J.D. Salinger: protected sequences constituted at least one-third of seventeen letters, and at least ten percent of forty-two letters. *Id.* 811 F.2d at 98–99. And I agree that the amount copied may be small, but still substantial. The Supreme Court in *Harper & Row* pointed out that, while in absolute terms the words quoted were an insubstantial portion of the protected work, what was taken was nevertheless "essentially the heart of the book," 471 U.S. at 564–65, 105 S.Ct. at 2232–33 (quoting the district court opinion, 557 F.Supp. at 1072). Also important is the contribution of the quoted material to the work accused of infringement. *Salinger* found that the taking there was significant qualitatively as well as quantitatively: Salinger's letters were quoted or paraphrased on approximately 40 percent of the biography's 192 pages, and they, "[t]o a large extent ... make the book worth reading." *Id.* at 99. *See also Harper & Row,* 471 U.S. at 566, 105 S.Ct. at 2233–34 (referring to the "key role in the infringing work" of excerpts taken from the protected work).

The amount and substantiality of the quotations used in this case are easily distinguishable from *Harper & Row* and *Salinger,* a matter which the majority opinion unfortunately glosses over. I have said that the quotations from the Asia Diaries are mostly found in Chapters 2 and 3, which deal in part with Hubbard's travels. Qualitatively, they are quite insignificant: as I mentioned above, the quotations are necessary to substantiate the author's factual assertions. However, they are not nearly so important as, in *Salinger*'s words, to "make the book worth reading." 811 F.2d at 99. Quantitatively, the quotations are but a fraction of the Asia Diaries: they are hardly "the heart" of the work, as was the case in *Harper & Row.* The diaries are not in our record, but there is an affidavit that states that they contain some 46,299 words, of which only a very small portion is quoted in *Messiah.* The quotations are also a small fraction of two chap-

ters in *Messiah* which, in turn, constitute 32 pages out of a 375–page book. Thus, the Asia Diaries quotations, in my view, satisfy the third factor of the fair use test. The same perhaps does not hold true of the letters to Helen O'Brien or to Hubbard's former spouse. The quotations used in *Messiah* are the heart of those letters, which weighs against a finding of fair use for those quotations—even though their publication does help Miller in his attempt to expose Hubbard as a hypocritical, cynical, and scheming personality. But none of these section 107 factors is exclusive, as we are all aware.

I now turn to the fourth factor set out in section 107, "the effect of the use upon the potential market for or value of the copyrighted work." *Harper & Row* tells us that this "is undoubtedly the single most important element of fair use." 471 U.S. at 566, 105 S.Ct. at 2233–34. Thus, we must assess the potential market for Hubbard's letters and the utilized portions of his Asia Diaries. Here the majority and I completely part company. As I see it, the district court correctly found that one who has an interest in reading Hubbard's writings—whether one is "for" or "against" Hubbard—would not satisfy that interest by reading *Bare–Faced Messiah* or the quotations in it. In my view it would be clear to any reader of *Messiah* "that she had not literally read Hubbard's writings," but, rather, that she had read a "hostile, critical biography using fragmentary extracts to demonstrate critical conclusions about him." 695 F.Supp. at 1523. The district court found, and I agree, that "readers would not be dissuaded from purchasing Hubbard's work by Miller's extracts," and that "Miller's use of Hubbard's writings will not affect the market for Hubbard's copyrights." *Id.* I see no reason, nor does the majority give us any indication (op. at 583), why this finding of fact is clearly erroneous, especially since the executor of Hubbard's estate testified that no appraisal had been done of Hubbard's unpublished works. The executor also acknowledged that "any biography that is not objectively favorable to Mr. Hubbard" would not be approved for publi-

cation, while claiming that *Messiah* was a "scumbag book" and "full of bullshit." Gready Aff. Ex A. at 84, 94, 105. Letters such as those to O'Brien or to Hubbard's ex-wife stand so little chance of publication by Hubbard's legatees that their quotation in *Messiah* will not impair the market for any publication that might later be approved by the legatees. The majority does not and cannot suggest otherwise. The Asia Diaries, on the other hand, would undoubtedly have a market with Hubbard aficionados despite the publication of excerpts from them in *Messiah*. It is therefore not at all difficult to distinguish this case from *Salinger*, where the copying of Salinger's letters made likely "some impairment of the market." 811 F.2d at 99. To the extent that *Messiah*'s criticism of L. Ron Hubbard diminishes the popularity of Scientology or impedes the sale of Hubbard's books pertaining to Dianetics or the Church of Scientology or its teachings, *Messiah* may be said to affect their marketability adversely. This sort of effect, of course, is not a factor either in a fair use assessment or in a determination of an appropriate remedy, since the Copyright Act does not protect any such interest. The majority errs when it says that "it is difficult to conclude, as does the district court, that the *book* published by Holt would have no effect on the market for New Era's forthcoming book." (Op. at 19 (emphasis added).) In fact, it is the effect of *Messiah*'s use of copyrighted material, not the effect of the book as a whole, that must be assessed here. Judge Leval carefully adhered to this distinction when considering section 107's fourth factor. *See* 695 F.Supp. at 1522–23.

Thus, I agree with the district court's ultimate conclusion that most of the material, including all of the published and much of the unpublished writings, is entitled to the fair use defense. I also agree with Judge Leval that the unpublished material that is not entitled to this defense is both quite small in quantity and most limited in quality, and that its marketability would in no way be affected by the publication of *Messiah*. To hold otherwise is in

my view also to engage in the appellate factfinding prohibited by Fed.R.Civ.P. 52.

## C. The Remedy

I come then to the truly critical question which the majority opinion, starting with different premises, deals with by reference solely to the Act and its constitutional underpinning: does the publication of even a small, but more than negligible, body of infringing material entitle the copyright holder to an injunction? The district court refused to enjoin further distribution of *Bare–Faced Messiah.* 695 F.Supp. at 1525–28. The court fully recognized that, while an injunction is a drastic remedy, *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311–12, 102 S.Ct. 1798, 1802–03, 72 L.Ed.2d 91 (1982), courts will readily find the requisite threat of irreparable injury in copyright cases, *see, e.g., Wainwright Securities, Inc. v. Wall Street Transcript Corp.,* 558 F.2d 91, 94 (2d Cir.1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). However, Judge Leval found that this was not a typical case of "opportunistic free riding." The copyright infringement here did not involve "profiteering by appropriating the creative effort and genius of another." 695 F.Supp. at 1525. In other words, the injury here was not irreparable. It is not a simple case of stealing another's expressions for personal advantage.

Rather, the suppression of *Messiah* would, as Judge Leval said, operate as a prior restraint and "implicate[ ] concerns of the First Amendment." *Id.* Judge Leval observed that earlier cases (*e.g., Rosemont, Meeropol*) avoided suppressing critical biographies by finding fair use. "Since *Salinger,*" however, the conflict between freedom of speech and the injunctive remedy is "inescapable." *Id.* at 1526. The judge concluded, and I agree, that "[t]here may ... be instances where solicitude for the author's commercial entitlements, especially in first publication, will motivate a court to protect his compensation right by denying a finding of fair use, while solicitude for a free press and free public discussion will require denial of an injunction." *Id.* He supported this view by citing the permis-

sive language of the Copyright Act, 17 U.S.C. § 502 (the court "may ... grant ... final injunctions"); past cases, *e.g., Dun v. Lumbermen's Credit Ass'n,* 209 U.S. 20, 23–24, 28 S.Ct. 335, 337, 52 L.Ed. 663 (1908) (discretion "wisely exercised" in copyright infringement case in refusing injunction against publisher of reference book with "insignificant" improper uses); and the vote of four justices in *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 499, 104 S.Ct. 774, 818, 78 L.Ed.2d 574 (1984) (Blackmun, J., dissenting) (award of damages, or continuing royalties or even some form of limited injunction "may well be an appropriate means of balancing the equities in this case"). Judge Leval also distinguished *Harper & Row* and *Salinger.* The former did not involve the issuance of an injunction; and while the latter did grant a preliminary injunction, the question whether a permanent injunction should issue was not raised. 695 F.Supp. at 1526. Finally, Judge Leval cited Professor Nimmer for the proposition that "where great public injury would be worked by an injunction, the courts might follow cases in other areas of property law[,] and award damages [or] a continuing royalty instead of an injunction under such special circumstances." *Id.* at 1528; *see* 3 *Nimmer* § 14.06[B], at 14–56.2. In short, the judge decided that this was "one of those special circumstances in which the interests of free speech overwhelmingly exceed the plaintiff's interest in an injunction." 695 F.Supp. at 1528.

I recognize the counter from *Salinger* that "[i]f [an author] copies more than minimal amounts of (unpublished) expressive content, he deserves to be enjoined," 811 F.2d at 96, and that "[m]isapplication of the appropriate legal principles constitutes grounds for overturning the denial or issuance of a preliminary injunction." *Id.* at 94. I am also aware that Judge Leval's mention of First Amendment concerns may not be easy to reconcile with the Supreme Court's statements in *Harper & Row* that "[i]t is fundamentally at odds with the scheme of copyright to accord lesser rights in those works that are of greatest impor-

tance to the public. Such a notion ignores the major premise of copyright and injures author and public alike," 471 U.S. at 559, 105 S.Ct. at 2230, and that *The Nation*'s First Amendment defense "would expand fair use to effectively destroy any expectation of copyright protection in the work of a public figure," *id.* at 557, 105 S.Ct. at 2229. Finally, I am aware of this court's observation in *Roy Export,* 672 F.2d at 1099, that "[n]o Circuit that has considered the question ... has ever held that the First Amendment provides a privilege in the copyright field distinct from the accommodation embodied in the 'fair use' doctrine." *See also* Patry, ch. 18: because copyright protects the expression of an idea but not the idea itself, "the only possible conflict between the First Amendment and the Copyright Act lies in the author's expression, viz., his individual characterization, phrasing, or styling of ideas. No court has ever held that the public has a right to know expression." *Id.* at 466.

I believe, however, that Judge Leval's denial of the injunction—a *remedy* for infringement—can be supported on grounds that *do* recognize these arguments and the cited authorities. Enjoining publication of a book is not to be done lightly. The power to enjoin, in this as in any case, must be exercised with a delicate consideration of all the consequences. *See Rosemont,* 366 F.2d at 310–11 (discussing whether preliminary injunction should be granted). Responsible biographers and historians constantly use primary sources, letters, diaries, and memoranda. Indeed, it would be *irresponsible* to ignore such sources of information. *See supra* note 3. Where, as here, the very limited use of those materials has been—I think properly—found not to affect their marketability, the grant or denial of an injunction remains an open question, to be determined by carefully balancing the appropriate factors. I say that it is an open question because the statute makes the injunction remedy discretionary, 17 U.S.C. § 502; the cases do the same,

*e.g., Rosemont;* and the leading commentators concur, B. Kaplan, *An Unhurried View of Copyright* 73 (1967) ("courts have sometimes forgotten that an injunction does not go of course; the interest in dissemination of a work may justify a confinement of the remedy to a money recovery"); 3 *Nimmer* § 14.06[B], at 14–56.2 & n. 28 (where injunction would work great injury, courts might grant other relief). Moreover, other areas of property law—if one takes a purely property-oriented view of copyright—offer a wealth of analogous cases in which injunctive relief is a matter of discretion. *See, e.g., Harrisonville v. W.S. Dickey Clay Mfg.,* 289 U.S. 334, 338, 53 S.Ct. 602, 603, 77 L.Ed. 1208 (1933) (nuisance; equitable relief denied where injunction would cause grossly disproportionate hardship and payment of money will afford substantial redress); *Boomer v. Atlantic Cement Co.,* 26 N.Y.2d 219, 257 N.E.2d 870, 309 N.Y.S.2d 312 (1970) (same); *Monroe Carp Pond Co. v. River Raisin Paper Co.,* 240 Mich. 279, 215 N.W. 325, 328 (1927) (riparian rights; same); *Quality Excelsior Coal Co. v. Reeves,* 206 Ark. 713, 177 S.W.2d 728, 734 (1944) (trespass; same); *Restatement (Second) of Torts* § 951 comment a (1979) (damages may be awarded in lieu of an injunction because of relative hardship or a countervailing public interest).

I think that the denial of an injunction was appropriate here for four reasons. First, the "economic incentive" for the creation and dissemination of ideas that is provided by the Copyright Act, *Harper & Row,* 471 U.S. at 546, 558, 105 S.Ct. at 2223, 2229, is not served by an injunction where there is no demonstrable impairment of the quoted materials' future market value. Yet an injunction against *Messiah* would certainly prevent the biography's further distribution in the United States—just as the Hubbard legatees sought, unsuccessfully, to prevent publication in England, Australia, and Canada.[7] An injunc-

---

7. Appellants suggest that all that would be required would be revision of the book so as to delete the infringing portions and to report facts and ideas. The district court found, however,

that "the expense and waste involved in republishing after deleting infringing material would be prohibitive." 695 F.Supp. at 1528. Nothing

tion in this case would therefore discourage writers and publishers who might otherwise undertake critical biographies of powerful people, without serving as an incentive for copyright holders. We might say, then, that denying an injunction here allows us "to avoid rigid application of the copyright statute when ... it would stifle the very creativity which that law is designed to foster." *Harper & Row,* 471 U.S. at 550 n. 3, 105 S.Ct. at 2225 n. 3 (describing fair use doctrine in general) (quoting *Iowa State,* 621 F.2d at 60).

Second, the public interest militates against granting an injunction in this case. "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Mercoid Corp. v. Mid–Continent Inv. Co.,* 320 U.S. 661, 670, 64 S.Ct. 268, 273, 88 L.Ed. 376 (1944) (quoting *Virginia Ry. Co. v. System Federation,* 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937)). The premise of the First Amendment is that "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1424–25, 89 L.Ed. 2013 (1945). This certainly applies in the case of a biography of a public figure.

> Biographies, of course, are fundamentally personal histories and it is both reasonable and customary for biographers to refer to and utilize earlier works dealing with the subject of the work and occasionally to quote directly from such works. This practice is permitted because of the public benefit in encouraging the development of historical and biographical works and their public distribution, e.g., so "that the world may not be deprived of improvements, or the progress of the arts be retarded."

*Rosemont,* 366 F.2d at 307 (citation omitted) (quoting *Sayre v. Moore,* 1 East. 361, 102 Eng.Rep. 138, 139 (K.B.1801)). Recognition of this point in determining whether to grant an injunctive remedy will not swallow the fair use rule, which after all is "equitable" in nature *per Harper & Row.*

Third, a non-injunctive remedy provides the best balance between the copyright interests and the First Amendment interests at stake in this case. In the words of Professor Goldstein, *Copyright and the First Amendment,* 70 Colum.L.Rev. 983, 1030 (1970):

> To be actionable, invasions of the copyright must effect economic harm and ... an award of damages should be preferred to the injunctive remedy. Since copyright property has economic value only, the principle would permit any public participation in the property which does not tend to impair its value. The preference for damages over injunctive relief is a corollary of the requirement of demonstrable injury. From a first amendment viewpoint, the effect of an injunction is to restrain the infringing expression altogether—an effect which goes beyond what is necessary to secure the copyright property. An award of monetary damages, which permits the infringing expression at a reasonable cost, is more tolerable from a first amendment point of view.

Finally, even without reference to the doctrine of unclean hands, *see supra* note 5, the fact that a good argument can be made, as the majority holds and as English and Canadian courts held, that the delay in New Era's proceeding with this case amounted to laches, *see Goodman v. McDonnell Douglas Corp.,* 606 F.2d 800, 804 (8th Cir.1979) (elements of laches are unreasonable and inexcusable delay that prejudices defendant), *cert. denied,* 446 U.S. 913, 100 S.Ct. 1844, 64 L.Ed.2d 267 (1980), is a factor to be weighed in the underlying determination whether to grant injunctive relief.

Applying traditional equitable principles, then, I would hold that Judge Leval did not abuse his discretion in declining to issue an injunction against publication of *Messiah,* leaving New Era a damages claim as to the

---

to which we are referred in the record would make this finding clearly erroneous.

very little, insignificant material unfairly used.